In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3626

DANIEL P. MINNICK,

*Plaintiff-Appellant*,

*v.*

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:12-cv-00265-JVB-RBC — **Joseph S. Van Bokkelen**, *Judge.*

ARGUED OCTOBER 28, 2014 — DECIDED JANUARY 7, 2015

Before BAUER, POSNER, and TINDER, *Circuit Judges.*

BAUER, *Circuit Judge.* Plaintiff-Appellant, Daniel P. Minnick
("Minnick"), suffers from a number of serious medical prob-
lems, including fibromyalgia, chronic obstructive pulmonary
disease ("COPD"), and degenerative disc disease. In 2010,
he applied for disability insurance benefits under the Social
Security Act. After the Disability Determination Bureau
("DDB") denied Minnick's claim in December 2010, Minnick

requested an administrative hearing before an Administrative Law Judge ("ALJ"). The ALJ determined that Minnick is not disabled within the meaning of the Social Security Act. The Appeals Council denied Minnick's request for review, rendering the ALJ's decision final. 20 C.F.R. § 404.981. Minnick then sought review in the district court, which affirmed the ALJ's decision on September 27, 2013. We conclude that the ALJ made a number of errors in her consideration of the record and therefore reverse and remand Minnick's case for further proceedings.

## I. BACKGROUND

The medical records in this case demonstrate that Minnick sought treatment for numerous health concerns over the years, but his chronic pain and back ailments predominate. At various times, Minnick has been assessed as having the following ongoing ailments: degenerative disc disease, spondylosis, COPD, fibromyalgia, migraine headaches, intermittent headaches, hypertension, anxiety, and depression. We confine our discussion of Minnick's medical records to the information most relevant to the ALJ's decision and this appeal.

### A. Medical Evidence

Minnick sought treatment for his pain beginning in May 2008, when he saw his attending physician, Dr. Brian Zurcher. Dr. Zurcher diagnosed severe joint pain. From September to November of that year, Minnick was also treated for exacerbation of his preexisting COPD. In December, he reported worsening shortness of breath related to his COPD, but still felt he could return to work.

In January 2009, Minnick saw Dr. Keith Harvey complaining of lower back pain radiating down both legs. Dr. Harvey believed the pain was likely muscular in nature, but secondary to deconditioning and obesity. Dr. Harvey suggested that Minnick may have fibromyalgia. When Minnick's condition did not improve, Dr. Harvey sent him for x-rays and an MRI of the lumbar spine, which revealed lumbar spondylosis, mild hypertrophic degenerative spur formation, and a bulging disc. As a result of these tests, Dr. Harvey diagnosed Minnick with lumbar spondylosis, recommended walking to get his weight down, and prescribed Vicodin for the pain. Another round of x-rays on December 14, 2009, showed disc space narrowing and an MRI showed mild degrees of spinal stenosis without evidence of spinal cord compression or nerve root compression. An MRI on December 16, 2009, analyzed this time by Dr. Zurcher, showed evidence of a disc protrusion involving two lumbar vertebrae, resulting in mild to moderate mass effect upon two nerve roots.

In June 2010, Minnick saw Dr. James Hanus, D.O., who listed daily headaches, intermittent migraines, and fibromyalgia as possible etiologies of Minnick's problems. At a follow-up in July, Dr. Hanus noted improvements with the headaches, but reported left back pain, thoracic pain, and carpal pedal spasms in Minnick's arms, as well as left leg pain. He diagnosed "[p]robably some" fibromyalgia, headaches, migraines, and thoracic pain.

In October 2010, rheumatologist Dr. David Campbell examined Minnick. Dr. Campbell assessed a positive straight leg raise in both legs at 30 degrees. He found no trigger points indicating fibromyalgia, but cautioned that he "could have

caught [Minnick] on a good day" and that Minnick's pain history was strongly suggestive of fibromyalgia. Minnick had two follow-up appointments with Dr. Harvey in November 2010. At the first appointment, Dr. Harvey increased Minnick's painkiller dosage. At the second appointment, he noted that the increased dosage had not helped manage Minnick's pain.

Minnick also met with DDB consultant Dr. B.T. Onamusi in November 2010. Dr. Onamusi diagnosed fibromyalgia with generalized muscle pain and fatigue, in addition to COPD. In his physical examination notes, Dr. Onamusi documented Minnick's ambulatory limitations: Minnick walked with a short gait, appeared to be in discomfort while he walked, needed a cane for long distance ambulation, and had difficulty transferring onto and off of the examination table due to pain. He also noted that Minnick had "few areas of trigger points." Another DDB consultant, Dr. J. Sands, reviewed Minnick's medical records in November 2010, but never examined him. After a review of the records, Dr. Sands opined that in an eight hour work day, Minnick could stand or walk for two hours and sit for six. He also stated Minnick could occasionally lift ten pounds, frequently lift less than ten pounds, could never climb ladders, ropes, kneel, crouch, or crawl, but could occasionally climb ramps or stairs, or balance or stoop. Dr. Sands' report did not reference Minnick's history of x-ray or MRI results.

In December 2010, Minnick saw Dr. Jose Panszi, complaining of pain in his legs from the hips down. Dr. Panszi documented Minnick's worsening pain, as well as his use of a cane and, alternatively, a walker.

In January 2011, Minnick saw Dr. Jon Karl for an orthopedic consultation. Dr. Karl noted a diminished range of motion in the lumbar spine, an antalgic gait, and positive straight leg raise tests in both legs. He diagnosed degenerative disc disease, prescribed Vicodin, and advised an epidermal steroid injection, which Minnick received a few days later. The day following the injection, Dr. Harvey prescribed a cane and a walker to help Minnick walk.

In February 2011, Minnick called Dr. Karl's office to report radiating pain up and down his spine. While visiting Dr. Karl's office a few days later, Minnick complained of constant pain. Barbara Starry, a nurse practitioner in Dr. Karl's office, upgraded Minnick's pain relief to Methadone. Dr. Karl also ordered an MRI, which showed degenerative disc disease and disc protrusions at L4-5 and L5-S1 in the lumbar vertebrae.

In April 2011, Minnick saw physical medicine and rehabilitation specialist Dr. Jason Sorg. Dr. Sorg noted that Minnick demonstrated significant pain behaviors during the examination, and used a cane to steady his slow, guarded gait. He diagnosed a central disc extrusion and concluded that spinal surgery would likely not provide significant relief to his widespread pain. He felt Minnick would benefit from a multidisciplinary chronic pain program. Subsequently, Minnick began physical therapy, which he attended from late April through June 2011. Throughout the course of physical therapy, Minnick continued to experience radiating pain, but also admitted that some days the therapy seemed to help. His therapist noted that Minnick used either a walker or a cane to maneuver around his home.

In July 2011, Dr. Karl again noted Minnick's continued complaints of severe pain and that Methadone had not helped alleviate the pain. He prescribed Oxycontin and Norco instead.

In August 2011, Minnick met with Dr. Rudy Kachmann, a neurologist, to discuss his severe pain and possible surgical options. On examination, Dr. Kachmann documented that Minnick was hypersensitive to touch over the skin, musculature on his neck, and mid and lower back—symptoms all consistent with fibromyalgia. Although Dr. Kachmann diagnosed fibromyalgia, he noted that Minnick's x-rays did not reveal anything connected to his pain problem and opined that Minnick suffered from "centralized cerebral pain." In hopes of alleviating his pain, Dr. Kachmann recommended that Minnick be weaned off narcotics, encouraged him to exercise, and suggested he read books about his condition. At a follow-up examination in October, Dr. Kachmann documented that Minnick had reduced his narcotics use—he had stopped taking Oxycontin entirely and was on a reduced dosage of Norco. He also noted that Minnick appeared to be in severe pain, was using a cane, and was still hypersensitive to touch. As a result of these findings, Dr. Kachmann diagnosed severe fibromyalgia and migraines. He also stated that a person in such a terrible pain condition could not be reeducated for work. Finally, he concluded that Minnick was "clearly disabled" and could not bend, twist, or lift more than five pounds on a regular basis.

### B. The November 16, 2011, Administrative Hearing

At the time of his hearing, Minnick was 46 years old. He testified that he was a truck driver for 24 years until taking short term leave in 2008 due to pain in his legs and hip. After returning to work, he was laid off.

He also testified to his pain and impairments. He described a state of constant pain in his hips, legs, and back of the head. In an attempt to manage his pain, Minnick's wife packs his legs in ice every morning while he is still in bed, where he stays for an hour and a half until he is he able to get up. The ice numbs his pain for about 5 hours, after which he has to lie down again because the pain becomes too intense. Due to the pain, he testified that he could sit for "probably about 30 minutes at the most" and stand for 20 minutes at a time. Occasionally, his wife would have to dress him because he is unable to bend. He also stated he is unable to help with any household chores.

When asked about additional limitations due to upper extremity pain, Minnick testified that he had difficulty reaching overhead and raising his arms to shoulder-level. He explained that he often drops plates and glasses because of his difficulty in grasping. He also testified that the pain limited his ability to use his hands and fingers, and thus, limited his ability to use his cane. Because the pain in his right hand would become so bad, he stated that he had to use his walker instead of the cane at least once a week. As to his lower extremities, Minnick testified that he frequently elevated his legs to reduce strain on his hips. He further testified that he was unable to squat, twist, bend, and struggled to climb stairs. According to Minnick,

these limitations and daily severe pain episodes render him unable to work.

At the end of the hearing, the ALJ questioned Sharon Ringenberg, a vocational expert ("VE"). The ALJ asked the VE whether a person of Minnick's age, education, and work experience could perform his past relevant work or other work given limitations based on the assessed Residual Functional Capacity ("RFC"). The ALJ established the RFC in reliance on Minnick's testimony and the opinions of several, but not all, treating and reviewing physicians. Limitations included the following: could lift and carry ten pounds occasionally and five pounds frequently; could stand or walk two hours and sit for six hours out of an eight-hour day; could occasionally balance, stoop, and climb ramps or stairs, but never kneel, crouch, crawl, or climb ladders, ropes, or scaffolds; had to use a cane when walking; needed to avoid exposure to airborne irritants; needed to avoid hazards including operational control of moving machinery, unprotected heights, or slippery and uneven surfaces; could not understand or remember detailed instruction; could not tolerate sudden or unpredictable workplace changes; and could only tolerate superficial-type interaction with supervisors, co-workers, and the public. In response, the VE stated that an individual with those limitations could not perform Minnick's past relevant work, but could perform the jobs of optical final assembler, addresser, and telephone order clerk.

### C.  The ALJ's December 21, 2011, Decision

Applying the familiar five-step analysis laid out in 20 C.F.R. § 416.920(a)(4), the ALJ concluded that Minnick is not disabled. At step one, she found that Minnick was not engaged in substantial gainful activity since the alleged disability onset date. At step two, the ALJ found that Minnick suffered from several severe impairments, but at step three concluded that Minnick's impairments did not meet or equal any listed impairment. In reaching her conclusion, the ALJ discredited Minnick because his hearing testimony and manner during the hearing were inconsistent with his earlier descriptions of his disabling limitations. The ALJ also discredited one of Minnick's treating physicians, Dr. Kachmann, because, according to the ALJ, Dr. Kachmann rendered inconsistent assessments and his findings were beyond the scope of his expertise. At step four, the ALJ found that Minnick cannot perform his past work, but can hold a job that limits his activity according to the RFC. At the fifth and final step, the ALJ relied on the VE's testimony and concluded that Minnick could work in various unskilled, sedentary occupations, such as optical final assembler, addresser, or telephone order clerk.

On January 5, 2012, Minnick filed a request for review with the Appeals Council of the Office of Disability Adjudication and Review. The Appeals Council denied Minnick's request for review, at which point Minnick filed a civil action in federal court. The district court affirmed the ALJ's decision on September 27, 2013. On appeal, Minnick argues that (1) the ALJ committed legal error by failing to adequately articulate why the claimant's combined impairments did not produce findings of equal medical significance to the criteria of Listing 1.04, and

(2) the ALJ erred by assessing an RFC that is not supported by substantial evidence.

## II. DISCUSSION

Because the Appeals Council declined Minnick's request for review, the ALJ's ruling represents the Social Security Commissioner's final decision. 20 C.F.R. § 404.981; *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). We review the ALJ's decision directly, without giving deference to the district court's assessment of the ALJ's decision. *Roddy*, 705 F.3d at 636. We will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (citation omitted). Although we will not reweigh the evidence or substitute our judgment for that of the ALJ's, *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012), "this does not mean that we will simply rubber-stamp the Commissioner's decision without a critical review of the evidence." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). In rendering a decision, an ALJ is not required to provide a complete and written evaluation of every piece of testimony and evidence, but "must 'build a logical bridge from the evidence to his conclusion.'" *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).

### A. The ALJ's Listing 1.04 Analysis

Minnick first argues the ALJ committed error by failing to adequately articulate why his combined impairments did not meet or equal the criteria of Listing 1.04. If a claimant has an impairment that meets or equals an impairment found in the

Listing of Impairments, a claimant is presumptively eligible for benefits. 20 C.F.R. § 404.1520(d). "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). The Listings specify the criteria for qualifying impairments. *Id*. (citing 20 C.F.R. § 404.1525(a)). A claimant may also satisfy a Listing by showing that his impairment is accompanied by symptoms that are equal in severity to those described in the Listing. 20 C.F.R. § 404.1526. A finding of medical equivalence requires an expert's opinion on the issue. *Barnett*, 381 F.3d at 670.

Listing 1.04 describes spinal disorders (including herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, and vertebral fractures), resulting in compromise of a nerve root or the spinal cord, with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. It also requires, in relevant part: "Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test." *Id*.

In determining Minnick's degenerative disc disease did not meet or equal Listing 1.04, the ALJ stated:

> The claimant's degenerative disc disease was evaluated under Listing 1.04 (disorders of the spine). The

evidence does not establish the presence of nerve root compression, spinal arachnoiditis, or spinal stenosis resulting in pseudoclaudication, as required by that listing.

This is the very type of perfunctory analysis we have repeatedly found inadequate to dismiss an impairment as not meeting or equaling a Listing. *See Kastner v. Astrue*, 697 F.3d 642, 647–48 (7th Cir. 2012) (remanding where the ALJ's cursory Listing analysis failed to articulate rationale for denying benefits when record supported finding in claimant's favor); *Barnett*, 381 F.3d at 670 (concluding the ALJ's "two-sentence consideration of the Listing of Impairments [was] inadequate and warrant[ed] remand."); *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (reversing because ALJ's Listing analysis was "devoid of any analysis that would enable meaningful judicial review."). The ALJ dismissed the possibility of Minnick's degenerative disc disease meeting or equally Listing 1.04's criteria in two sentences. Beyond these two sentences, she provided no analysis whatsoever supporting her conclusion.

As a particular example of the Listing analysis' inadequacy, the ALJ failed to acknowledge several aspects of the record that could in fact meet or equal Listing 1.04. Most notably, the ALJ apparently ignored Minnick's December 16, 2009, MRI, showing mild to moderate mass effect on two nerve roots, which can be indicative of nerve root compression. Paired with Minnick's testimony that his pain limited his ability to use his fingers (motor loss accompanied by reflex loss) and the positive straight leg tests, Minnick's degenerative disc disease may well have satisfied Listing 1.04A. We cannot discern from

the ALJ's scant analysis whether she considered and dismissed, or completely failed to consider, this pertinent evidence. If the ALJ did consider and dismiss some or all of this evidence, she never so stated. Moreover, the ALJ never sought an expert's opinion as to whether any of the evidence could support a finding of equivalency. *See Barnett*, 381 F.3d at 670–71 (stating ALJ's assumption of absence of equivalency without any relevant discussion and without consulting an expert's opinion could not support the decision to deny benefits). Thus, the ALJ erred by failing to build a logical bridge from the evidence to her conclusion. *See Schmidt*, 395 F.3d at 744.

### B.  The ALJ's Residual Functional Capacity Assessment

Minnick also argues the ALJ erred by assessing an RFC that was not supported by substantial evidence. Specifically, Minnick challenges the ALJ's consideration of both his own credibility and the opinion evidence of treating physician, Dr. Kachmann.

#### 1.  Minnick's Credibility

In reaching her RFC determination, the ALJ discredited Minnick's testimony using the type of boilerplate language that we have consistently criticized, *see, e.g., Roddy*, 705 F.3d at 635; *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Bjornson v. Astrue*, 671 F.3d 640, 644–45 (7th Cir. 2012), stating that although his impairments "could reasonably be expected to cause some of his alleged symptoms … the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." By itself, "[s]uch boilerplate language fails to

inform us in a meaningful, reviewable way of the specific
evidence the ALJ considered in determining that claimant's
complaints were not credible." *Bjornson*, 671 F.3d at 645.
Although the ALJ did provide some explanation in support of
this boilerplate language, we remain unpersuaded that
substantial evidence supports her conclusion in light of the
record as a whole.

In support of her conclusion, the ALJ first remarked that
Minnick's low back pain was attributed to deconditioning,
obesity, and resumption of tree trimming work, rather than his
allegedly disabling impairments. This attribution presumably
refers to the only instance in which tree trimming work is
mentioned in the record: a January 2009 assessment by
Dr. Harvey. It does not account for the record of pain, corrobo-
rated by a number of doctors, that continues from 2008 into
2011. The ALJ also focused on Minnick's testimony that he
could "sit for 30 minutes at the most," yet sat for over 40
minutes during the hearing, and for a full hour before a
consultative examiner. However, at least one doctor of record
opined that he "could have caught Minnick on a good day."
So, too, could the ALJ and the consultative examiner. More-
over, Minnick's full testimony was that he could *probably* sit for
30 minutes at the most, suggesting at least the possibility of
longer stretches without issue. Finally, Minnick's ability to sit
without exhibiting pain-related behaviors at the hearing does
not undo the consistent record of pain-related behaviors
exhibited before nearly every one of Minnick's treating
physicians. Finally, and perhaps most critically, the ALJ never
mentioned two studies in the record that indicated Minnick's
herniated discs were affecting his nerve roots. Nerve root

contact provides an objective medical explanation for at least some of his pain and weakness.

In *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000), the ALJ did not find the claimant's testimony credible because it was contradicted by her daily activities and the medical evidence of record. We reversed the ALJ's credibility determination, however, explaining that "the ALJ must consider a claimant's subjective complaint of pain if supported by medical signs and findings." *Id*. at 871. Though an ALJ's credibility determination may only be overturned if it is "patently wrong," *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), a failure to adequately explain his or her credibility finding by discussing specific reasons supported by the record is grounds for reversal. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Bjornson*, 671 F.3d at 649. Here, the ALJ did not provide a reason for omitting from her analysis the objective medical evidence in the record supporting Minnick's subjective complaints. Without a logical bridge between the evidence and the ALJ's conclusion, we lack a sufficient basis upon which to uphold the ALJ's determination of Minnick's credibility.

### 2. Dr. Kachmann's Opinion

Minnick also argues that the ALJ improperly discounted the opinion of treating physician Dr. Kachmann in assessing the RFC. Dr. Kachmann treated Minnick twice. The first time, he opined that Minnick should exercise, read up on his condition, and be weaned off narcotic medication. He also diagnosed centralized cerebral pain and fibromyalgia. The second time two months later, he opined that Minnick could not do any bending or twisting, was unable to be reeducated

for work, and was "clearly disabled." Dr. Kachmann then diagnosed severe fibromyalgia and migraines. The ALJ found the opinions inconsistent. The ALJ also found that Dr. Kachmann's opinions regarding hiring practices were outside the scope of his expertise and that his opinions regarding Minnick's ability to bend and twist were unsupported by the record. For these reasons, the ALJ gave Dr. Kachmann's opinion only limited weight.

Under 20 C.F.R. § 404.1527(c)(1), an ALJ should "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]" because of his greater familiarity with the claimant's conditions and circumstances. Section 404.1527(c)(2) further provides "[i]f [the ALJ] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

In discounting Dr. Kachmann's opinion that Minnick could not bend or twist, the ALJ stated the limitation to occasional stooping in the RFC was better supported by the record as a whole. The ALJ failed to explain why Dr. Kachmann's opinion that Minnick could not bend or twist was not supported by the record, particular as to twisting. This was error. *See Roddy*, 705 F.3d at 636–37 (finding ALJ should have, but did not, explain why treating physician's opinion about severity of claimant's pain was inconsistent with record evidence indicating pain); *see also Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) (finding

ALJ erred in failing to explain disregard of pertinent record evidence). First, it is unclear from the ALJ's opinion how the ability to occasionally stoop would mean Minnick could also twist. Second, the record contains a number of other doctors' opinions suggestive of Minnick's inability to bend or twist. For example, Dr. Karl and Dr. Onamusi, both treating physicians, noted Minnick had a diminished range of motion in the lumbar spine. Further, the only doctor to recommend stooping was Dr. Sands, a non-treating physician. His recommendation was a check-box style review of Minnick's records, meaning Dr. Sands was not obligated to, and indeed did not, provide any reasons for his conclusion.

The ALJ also discounted Dr. Kachmann's opinion due to internal inconsistencies. Internal inconsistencies may provide good cause to deny controlling weight to a treating physician's opinion, but the reasoning for the denial must be adequately articulated. *Roddy*, 705 F.3d at 636–37. Though the ALJ found inconsistencies in Dr. Kachmann's reports, we do not see any conflict between his two opinions. It is not unreasonable to believe that Dr. Kachmann felt exercise could be helpful to Minnick, but later found that he is unable to bend or twist. For example, Minnick's decreased usage of narcotics is noted in the record between his August and October visits with Dr. Kachmann; the reduced painkiller use could indicate that Minnick was in more pain in the October meeting than in the August one, diminishing his ability to tolerate certain movements. The ALJ also took issue with Dr. Kachmann's recommendation that Minnick read a few books on his condition compared to his later statement that Minnick could not be reeducated for work. An inability to be reeducated for work is

not necessarily incompatible with the ability to educate oneself on one's own condition.

The ALJ has a duty to fully develop the record before drawing any conclusions and must adequately articulate her analysis so that we can follow her reasoning. *Murphy*, 496 F.3d at 634. Without explaining how or why Dr. Kachmann's bending and twisting opinion was not supported by the record, we are unable to properly review the ALJ's opinion determination. Similarly, the ALJ did not adequately articulate why Dr. Kachmann's statements were internally inconsistent. In light of these errors, the ALJ must reevaluate whether Dr. Kachmann's findings are entitled to controlling weight.

### III. CONCLUSION

Our task is to determine whether substantial evidence supports the ALJ's conclusion. We believe that it does not. For the reasons discussed above, we REVERSE the judgment of the district court upholding the Acting Commissioner's decision to deny benefits to Minnick and REMAND for further proceedings consistent with this opinion.