NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 26, 2016
Decided May 4, 2016

**Before**

MICHAEL S. KANNE, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 15-2578

| | |
|---|---|
| JUTTA SPIES,<br>　　　*Plaintiff-Appellant*, | Appeal from the United States District Court for the Western District of Wisconsin. |
| *v.* | |
| | No. 14-cv-568-jdp |
| CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br>　　　*Defendant-Appellee*. | James D. Peterson,<br>*Judge*. |

## O R D E R

Jutta Spies applied for Disability Insurance Benefits and Supplemental Security Income claiming that her diabetes and related neuropathy, osteoarthritis, rheumatoid arthritis, and headaches prevent her from working. An administrative law judge denied benefits, finding that Spies could perform light work with several limitations. In this court Spies challenges the ALJ's adverse credibility finding and his refusal to give controlling weight to a treating physician's opinion. Because the ALJ's decision is supported by substantial evidence, we affirm the district court's order upholding the denial of benefits.

## I. Background

In 2012 at age 47, Spies applied for DIB and SSI, alleging onset in October 2008 (later amended to October 2012) and claiming six impairments: diabetes; neuropathy in the feet and hands; osteoarthritis in the neck, shoulders, and arms; nerve damage in the neck, shoulders, and arms; rheumatoid arthritis in the lower back and knees; and headaches. She had applied for benefits previously in 2008, but in 2010 an ALJ had rejected that application. The Appeals Council upheld the denial. Afterward Spies initiated a challenge under 42 U.S.C. § 405(g), but later she dismissed the action voluntarily. *Spies v. Astrue*, No. 3:12-cv-00231-wmc (W.D. Wis. Aug. 31, 2012).

Some of the evidence Spies submitted to support her current application predates the finding in 2010 that she was not disabled. For example, in 2009 a doctor had evaluated Spies after she complained of musculoskeletal pain. The doctor observed that Spies walked with her shoulders rounded forward and also held her head forward, but still he concluded that Spies's shoulder motion was "full and pain free," and that her neck motion was "nearly complete with pain-free end range" except for "rotation and side bending to the left." The doctor identified trigger points in Spies's trapezii and administered trigger-point injections. A back X-ray showed narrowing of disc spaces and some flattening of the spine, evidencing degenerative changes. Spies was prescribed physical therapy and gabapentin (an anticonvulsant sometimes given for nerve pain).

A questionnaire completed in 2009 by internist Margaret Webster and a letter that she wrote in November 2010 are two other pieces of recycled evidence. Dr. Webster had first treated Spies in 2002, and in the questionnaire (completed for Spies's former lawyer) she opined that Spies must elevate her feet with prolonged sitting, needed leeway to take unlimited breaks, and would miss more than two days of work per month. Dr. Webster added that she lacked information about Spies's ability to lift weight and could not evaluate how long she could sit, stand, or walk continuously or in a work day. In the 2010 letter (written in response to the same lawyer's inquiry), Dr. Webster clarified that Spies experiences tingling and numbness in her legs and feet, and that elevating her feet would help prevent swelling. The breaks were needed, the doctor said, so that Spies could change position and lessen discomfort from "deconditioning" and pain in her upper back and neck.

After the initial denial of benefits, Spies had continued seeing Dr. Webster for regular check-ups. Dr. Webster's progress notes document treatment for Type II Diabetes, which was poorly controlled by Spies and prompted a referral to an endocrinologist. He commenced ongoing treatment in April 2011 prescribing and later

adjusting the amount of insulin. During the initial consultation the endocrinologist noted that Spies had complained of numbness and burning in her hands and feet, which, he initially thought, might be partially attributable to degenerative disc disease. But a monofilament test (used to gauge the sensitivity of a patient's extremities) was normal except for "decreased sensation at the right great toe." The endocrinologist added, in commenting on Spies's reports of diabetic peripheral neuropathy affecting her hands and feet, that her reported symptoms were "not particularly classic" for that impairment though it "could be making her other neurologic conditions worse." A second monofilament test performed in September 2011 also led the endocrinologist to conclude that Spies's sensation was intact. That month Spies returned to Dr. Webster for another regular check-up and reported continuing pain in her neck and back for which she was not taking medication.

In May 2012, Spies submitted a "function report" to the Social Security Administration asserting that she can sit, stand, or walk only for 10 minutes at a time and that she must elevate her legs 75% of the time. During an entire day, Spies continued, she can sit at most for 8½ hours, stand for 4½ hours, and walk for 2½ hours. She reported difficulty lifting, bending, stooping, kneeling, and walking. Spies said that she cleans her house, though the task takes all day because of her need for frequent breaks, and she helps care for her grandson. She does laundry but cannot carry the clothes up or down stairs and cannot bend to vacuum. She added that she shops once a month for 4 to 5 hours.

Another back X-ray in June 2012 showed mild degeneration, including some development of bone spurs around the thoracic and lumbar discs. That month Spies was examined by state-agency consulting osteopath Brian Allen and reported pain in her neck, shoulders, arms, back, and knees that she was treating with ibuprofen. Spies also reported that she could stand only for 10 minutes and walk only a block. The doctor found reduced range of motion in her shoulders, knees, and ankles, and swelling in her ankles. Spies had full strength and normal sensation in her extremities, and she could tandem walk, squat, and hop on each foot. The doctor concluded that her neck and back pain appeared to be originating from her muscles or the joints in her spine.

The SSA initially denied benefits on June 25, 2012. Another state-agency consulting physician had reviewed the medical evidence and concluded that Spies could perform sedentary work not requiring overhead lifting. He opined that her medical records and daily activities suggested that Spies had exaggerated her self-reported functional limitations.

Afterward, in July 2012 while her case was before the SSA on reconsideration, Spies was treated by a nurse practitioner. Spies reported intermittent pain in her neck, pain in her shoulders, and numbness in her hands and feet. The pain, she said, ranged from 3 to 9 on a 10-point scale. The nurse practitioner concluded that Spies had full flexion, extension, and lateral rotation in her neck though extension increased her pain. Her trapezii were very tight, and she was experiencing muscle spasms. Spies's shoulder joints were tender, and she had pain with forward flexion, internal and external rotation, and thumbs up and thumbs down motions. She had full strength in her extremities but difficulty with tandem walking and slight swelling in her legs. Spies was prescribed an anti-inflammatory and muscle relaxant, and the nurse practitioner recommended a shoulder X-ray plus physical therapy for her neck and shoulders.

Spies received a voucher for the physical therapy from St. Clare Health Mission, but after just two sessions she said that she would call if she needed further assistance. St. Clare also filled her prescriptions and arranged for the X-ray, which showed straightening of the spine and moderate enlargement along the vertebral endplates. At a cervical spine assessment in August 2012, Spies reported that for three months she had been in constant pain which hindered her daily activities. She reported that the anti-inflammatory had helped her pain, but she later stopped taking it and the muscle relaxant because they upset her stomach, instead occasionally taking ibuprofen.

At her next appointment with Dr. Webster in September 2012, Spies again reported persistent back and shoulder pain that impeded her daily activities. Yet Spies was uninsured, so rather than treat her, Dr. Webster recommended that she continue the treatment she was receiving elsewhere.

Spies then submitted another "function report" to the SSA asserting that she could sit, stand, or walk for only 10 minutes continuously, for a total of one hour each per day. With her daughter's help she could bathe and dress, and once each month shop for 3 hours.

Benefits were denied on reconsideration two months later, in March 2013. A different state-agency consultant, Dr. Mina Khorshidi, had concluded that Spies could perform light work with limited overhead lifting if she avoided hazards like machinery and heights. Like the previous consulting physician, she opined after reviewing the medical evidence and Spies's daily activities that Spies was exaggerating her self-reported functional limitations.

At current counsel's request, Dr. Webster then wrote a "to whom it may concern" letter opining that Spies cannot perform competitive full-time work. For more than 75% of a typical workday, the doctor predicted, Spies's "multiple medical conditions" would prevent her from performing job tasks. Those conditions, Dr. Webster added, had "progressed over time." Dr. Webster apparently declined, however, to serve in the role of a consultative examiner.

Spies appeared before an ALJ in November 2013. During the hearing she amended her alleged onset date to October 1, 2012. She testified that previously she had worked as a camera operator and preschool teacher, neither of which required much lifting. As a camera operator she alternated between sitting and standing, for about 4 hours each in an average workday. She complained of constant pain in her neck and shoulders, headaches, swollen legs and ankles, random numbness in her hands and feet, and numbness in her arms so pronounced that several times a week she cannot lift them. She said that she could stand or walk for 5 minutes and sit for 10. She must alternate between sitting and standing, said Spies, and needed to elevate her feet 12 to 15 inches to prevent her ankles from swelling and her becoming stiff. Spies testified that her pain is progressively worsening.

Spies lacked health insurance and testified that she relied upon financial assistance to see Dr. Webster. When asked by her lawyer if Dr. Webster would prefer to see her more than once a year, Spies simply replied that Dr. Webster performed her "yearly physical for diabetes," and that she was to see the endocrinologist on a quarterly basis. Her attorney asked a series of questions about jobs that might have been available to Spies in October 2012, which prompted the ALJ to comment that Spies was answering counsel's questions before he had completed them.

A vocational expert also testified. The ALJ first asked if jobs classified as light work are available for a person who can occasionally stoop, crouch, kneel, and crawl; can occasionally climb stairs or ramps but not ladders, ropes or scaffolds; cannot be exposed to unprotected heights or large, open machinery; and is likely to be off task up to 10% of the day in addition to scheduled breaks. The VE replied that suitable employment is available, including Spies's past jobs as a camera operator and preschool teacher, as well as jobs as an inspector or sorter, clerical cashier, and stock clerk. When questioned further, the VE said that the job of preschool teacher would be eliminated if the person also would need to sit or stand at will, but that a further restriction allowing for elevation of the person's feet 75% percent of the day would not eliminate any more jobs. On the other hand, the VE acknowledged, all full-time employment would be

precluded if the person would require unscheduled breaks at will or would be distracted to the extent of being off task for more than 10% of the day. Finally, the VE opined that a person restricted to sedentary work with the same functional limitations could be a production worker, information clerk, or general office clerk.

The ALJ issued a written decision two months later finding Spies not disabled. At Step 1 of the 5-step analysis, *see* 20 C.F.R. §§ 404.1520(a), 416.920(a), the ALJ acknowledged that Spies had not engaged in substantial gainful activity since the amended onset date in October 2012. At Step 2 the ALJ identified Spies's impairments (all of them severe) as peripheral neuropathy, osteoarthritis of the back and knees, cervical disc disease, and obesity. Excluded from this list was diabetes and rheumatoid arthritis. At Step 3 the ALJ concluded that the identified impairments, alone or in combination, did not meet a listing for presumptive disability. Spies does not dispute these conclusions.

At Step 4 the ALJ partly rejected Spies's account of disabling functional limitations. This adverse credibility assessment first recites boilerplate language rejecting as not credible Spies's statements about the "intensity, persistence, and limiting effects" of her impairments. The ALJ then opined that Spies's physical and neurological examinations had been "largely benign" and that X-rays had shown little beyond "mild degenerative changes." He reasoned that the medical evidence contradicts Spies's complaints of pain reaching 9 on a scale of 10. The ALJ accepted the view of the state-agency consultants that, given her daily activities and the medical evidence, Spies was exaggerating her limitations. Specifically, the ALJ noted, she purportedly could not stand or walk for more than 2 hours per day but had normal physical examinations and acknowledged cleaning her house, helping care for her grandson, and shopping for 3 hours at a time. The ALJ added that during her testimony "it became evident" that Spies "had predetermined that her responses would be a claim of inability to perform any described task or activity." Finally, he noted that Spies had said her condition was worsening, yet a recent cardiac stress test was favorable. Still, the ALJ included in Spies's residual functional capacity that she would need to elevate her feet and switch at will between sitting and standing.

The ALJ gave Dr. Webster's opinions about Spies's functional limitations only moderate weight, since the doctor had been seeing Spies typically once a year and her opinions were based on Spies's self-reports instead of clinical evidence. Moreover, the ALJ noted, Dr. Webster had conceded in the 2009 questionnaire that she either lacked relevant information or could not evaluate Spies's exertional limitations. The ALJ

concluded that Dr. Webster's views were "speculative and conclusory with regard to issues reserved for the Commissioner."

Finally, at Step 5 the ALJ found that Spies could perform her past work as a camera operator, as well as other available jobs.

The Appeals Council denied review, making the ALJ's pronouncement the final decision of the Commissioner. The district court upheld that decision.

## II. Analysis

On appeal Spies first raises several challenges to the ALJ's adverse credibility finding, but none shows that the credibility finding is patently wrong. *See Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015) (noting that ALJ's credibility finding must be upheld unless patently wrong). Spies contends that the finding is flawed because, she says, it rests entirely on boilerplate frequently criticized by this court. But Spies must recognize her own hyperbole because, as even she acknowledges elsewhere in her brief, the ALJ went beyond the boilerplate and gave specific reasons for the adverse credibility finding. And the mere inclusion of boilerplate does not require a remand. *See Loveless v. Colvin*, 810 F.3d 502, 507–08 (7th Cir. 2016); *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013).

Although greater detail would have been helpful, the ALJ touched on four reasons for disbelieving Spies. First, the ALJ reasoned that the medical evidence raises doubts about the degree of pain Spies reported because "her physical and neurological examinations are largely benign and x-rays show little more than mild degenerative changes." Most of Spies's attacks on the credibility finding seem to focus on this statement. She argues that the ALJ identified neuropathy as a severe impairment but then failed to acknowledge that it could have caused the pain she reported, which could not be confirmed by X-rays. Spies is correct that neuropathic pain need not be confirmed by diagnostic tests in order to be credited. *See Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015). But her contention is disingenuous: Spies complained of severe pain—pain that sometimes reached a 9 on a 10-point scale—in her neck and shoulders. She never claimed that neuropathy was causing pain in her neck or shoulders, only that it caused tingling, numbness, swelling, or burning in her extremities.

Similarly, Spies argues that the ALJ could not minimize her accounts of pain simply because physical examinations and diagnostics provided only weak objective support. Spies and her doctors attributed her neck and shoulder pain to degenerative

disc disease and osteoarthritis. Thus, this is not a situation where a claimant's pain was from an undetermined source, making self-reports the only available evidence of severity. *See, e.g., Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015); *Pierce v. Colvin*, 739 F.3d 1046, 1049–50 (7th Cir. 2014). And the ALJ did not disbelieve that Spies was experiencing pain, but only that the diagnosed impairments she and her doctors identified as the source of her pain were not severe enough to disable her to the extent alleged. *See Mitze v. Colvin*, 782 F.3d 879, 881 (7th Cir. 2015) (noting that ALJ had not denied that claimant was in pain but instead "didn't believe that the pain was severe enough to disable her to the extent she claimed").

Spies also says that her own doctors believed and acted upon her reports of pain, and thus, she insists, the ALJ was "playing doctor" when he decided that the medical evidence undermines those self-reports. But all of the medical evidence Spies cites for this contention predates the amended onset date of October 2012, and most of it also predates the initial, unchallenged finding in 2010 that she was not disabled. What is missing from this record is evidence that Spies's condition had deteriorated to the point of disability *after 2010* because she cannot relitigate whether she was disabled before then. *See Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) (noting binding effect of previous, unchallenged finding that claimant was not disabled); *Groves v. Apfel*, 148 F.3d 809, 810–11 (7th Cir. 1998) (explaining that evidence from previous denial of benefits cannot by itself establish disability in later case but "still might reinforce or illuminate or fill gaps in the evidence developed for the second proceeding"). And the only recent treatment of Spies's neck and shoulder pain was by the nurse practitioner and at St. Clare Health Mission. The nurse practitioner had prescribed a muscle relaxant and an anti-inflammatory, but Spies unilaterally discontinued both because of stomach upset without exploring alternatives. She likewise unilaterally stopped going to physical therapy at St. Clare after just two sessions. The record does not support Spies's contention that her doctors acted on her complaints of pain in a way that corroborates her claims of its severity.

Spies goes one step further and contends that her financial constraints obligated the ALJ not only to evaluate the resulting limitations on her medical treatment but also to order an MRI that could detect any soft tissue damage consistent with her allegations of disabling pain. Again, this contention is disingenuous. For one, the ALJ never faulted Spies for not pursuing additional treatment, so he did not need to inquire about her financial means. *Cf. Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). And on this record there is no reason to believe that Spies's treatment would have been significantly different had she been insured. The medications she stopped using and the physical

therapy she declined were being paid for by St. Clare. Moreover, at the hearing before the ALJ, Spies did not give her lawyer the answer he was looking for: that Dr. Webster would have liked to see her more than once a year. Most importantly, nowhere in Spies's medical records is there mention of a need for an MRI. Spies, who was represented by present counsel, did not argue before the ALJ that an MRI should be ordered and did not highlight any potential soft-tissue damage that such a diagnostic might reveal. *See Thomas v. Colvin*, 745 F.3d 802, 807–08 (7th Cir. 2014) (noting that ALJ's obligation to develop record is not limitless); *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) (explaining that even when ALJ has duty to expand record, speculation that additional evidence could have been obtained does not warrant remand); *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007) (noting that counseled claimant is "presumed to have made his best case before the ALJ").

The ALJ's second reason for disbelieving Spies is the disconnect between her medical evidence and daily activities, on the one hand, and her assertion that she cannot be on her feet for more than 2 hours total each day. Spies argues that the ALJ "did not even make an actual credibility finding, instead relying on the State Agency's assessment of her daily activities." Although the ALJ's reference to Dr. Khorshidi's opinion is perhaps poorly worded, the fair reading is that he incorporated the doctor's reasoning. And that opinion was not, as Spies now insists, that her daily activities prove her capable of working full time. Instead, Dr. Khorshidi opined that Spies's daily activities indicate exaggeration of her functional limitations. *See Loveless*, 810 F.3d at 508 (citing 20 C.F.R. § 404.1529(c)(3)(i)).

The ALJ next discounted Spies's credibility because he thought her testimony showed a predisposition to deny her ability to perform any task or activity posed to her. Spies tries to refute the ALJ's conclusion by referring to seemingly random parts of her testimony, but Spies's reading of the ALJ's comment is unreasonable. The plausible reading is that the ALJ had observed Spies answering her lawyer's questions about her ability to work even before the attorney had completed the questions. That the ALJ did not say this directly does not undermine his credibility finding. *See Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012) (noting that ALJ isn't required to identify particular statements found not credible); *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003) (rejecting claim that credibility finding was flawed because ALJ did not identify particular statements found not credible).

Last, the ALJ discredited Spies because, he concluded, Spies had not submitted evidence substantiating her testimony that her condition had deteriorated significantly.

The ALJ's conclusion rests on Spies's most-recent medical report, the results of a cardiac stress test. We do not understand the relevance of this report, since Spies's alleged disability is unrelated to her cardiac health. But neither do we believe that this misstep by the ALJ undermines the credibility finding. *See Shideler*, 688 F.3d at 312 (upholding imperfect credibility determination); *McKinzey v. Astrue*, 641 F.3d 884, 890–91 (7th Cir. 2011) (same). Although the ALJ does not cite this exchange, during the hearing he questioned Spies about the drastic difference in her reported ability to sit, stand, and walk between her first and second "function reports." She initially reported being able to sit for 8½ hours, stand for 4½ hours, and walk for 2½ hours but then reduced each to 1 hour. Spies has not pointed to anything that would explain this rapid deterioration. In this court, she asserts only that her receipt of steroid injections "during the relevant period" proves that her condition had deteriorated. But Spies grossly misrepresents the record: She received one round of trigger-point injections in 2009, before the earlier finding that she was not disabled. There is no other evidence of injections, much less steroid injections.

Accordingly, Spies's challenge to the ALJ's credibility assessment is unpersuasive, and her remaining appellate claim is even weaker. Spies contends that the ALJ erred by not giving controlling weight to Dr. Webster's views about her functional limitations. To start, both the 2009 questionnaire and Dr. Webster's 2010 clarifying letter predate the earlier determination that Spies was not disabled, and Spies does not explain how they are significant to this case. Indeed, the first ALJ explicitly found these submissions from Dr. Webster to be unreliable. Regardless, the ALJ here discussed all of Dr. Webster's opinions, and he provided good reasons for discounting them. *See Schaaf v. Astrue*, 602 F.3d 869, 874–75 (7th Cir. 2010) (noting that ALJ must give good reason for rejecting treating physician's opinion that is supported by medical evidence and "not inconsistent" with substantial evidence in record). First, Spies typically saw Dr. Webster just once a year. *See* 20 C.F.R. § 404.1527(c)(2)(i) (explaining that SSA gives greater weight to treating source who has seen claimant on frequent basis); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012) (acknowledging § 404.1527(c)(2)(i)). Spies now asserts that the infrequent contact was because of financial constraints, but she explicitly said the opposite at the hearing. In fact, she testified that she had been receiving financial assistance to pay for Dr. Webster's treatment.

What is more, Dr. Webster's opinions were based on Spies's subjective reports of pain instead of any clinical evidence. *See Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004); *Smith v. Apfel*, 231 F.3d 433, 441 (7th Cir. 2000). Dr. Webster's progress notes document Spies's reports of her symptoms and limitations, but the doctor never provided any

relevant treatment. And, as the ALJ noted, Dr. Webster acknowledged that she had no data regarding the severity of Spies's pain.

And, finally, the ALJ concluded that Dr. Webster's opinions were speculative and conclusory on issues that are reserved for the Commissioner. In the November 2013 "to whom it may concern" letter, Dr. Webster asserted that Spies could not work. But that opinion is not a *medical opinion*, and thus it was entitled to no weight, even coming from a treating physician. *See* 20 C.F.R. § 404.1527(d)(1); *Loveless*, 810 F.3d at 507; *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

## III. Conclusion

We AFFIRM the district court's judgment.