NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued July 7, 2021
Decided August 19, 2021

*Before*

FRANK H. EASTERBROOK, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

THOMAS L. KIRSCH II, *Circuit Judge*

No. 20-2990

| | |
|---|---|
| DERRICK J. WEBER,<br>        *Plaintiff-Appellant*, | Appeal from the United States District<br>Court for the Central District of Illinois. |
| *v.* | No. 2:19-cv-02295 |
| KILOLO KIJAKAZI,<br>Acting Commissioner of Social Security,<br>        *Defendant-Appellee*. | Colin S. Bruce,<br>*Judge*. |

## O R D E R

Derrick Weber, now 43, is a Persian Gulf War veteran who sustained several injuries during combat. Two different administrative law judges at the Social Security Administration found that he is still able to perform some sedentary work. The district court upheld the latest denial of benefits. Weber appeals, contending that the last ALJ failed to adequately explain her assessment of Weber's residual functional capacity. But the ALJ's decision is supported by substantial evidence, so we affirm.

I

Weber suffered blast-related injuries after his military vehicle was hit by a rocket-propelled grenade in Iraq in 2004. He had multiple surgeries to remove shrapnel

from his body. He also underwent reconstructive surgery to his right ankle, for which doctors grafted skin from his left wrist. Based on continuing medical needs, he was honorably discharged from the military in mid-2005. The Department of Veterans Affairs awarded him disability benefits in late 2007.

In 2013, Weber applied for social security benefits, alleging that he became disabled in mid-2006 from a combination of physical and mental impairments. Because his insured status expired in late 2011, he had to prove that he became disabled on or before then. On appeal here, Weber challenges only the ALJ's assessment of his mental limitations and his left-wrist restrictions, so we limit our account of his other complaints accordingly.

A

We begin with Weber's mental limitations. In 2006, Weber attended a walk-in appointment through the VA's Trauma Recovery Project, which provides counseling to veterans, and reported difficulty working normal hours while he was employed as a sales clerk and security guard. A physician's assistant noted he was taking an antidepressant and assessed a Global Assessment of Functioning (GAF) score of 55, signaling some difficulty with social functioning.

Weber quit working that summer and provided conflicting accounts of his mental health. During an emergency room visit, he told staff he had a history of battle wounds and depression. But at other appointments, he screened negative for depression and denied any ongoing symptoms of post-traumatic stress disorder (PTSD).

In late 2007, Dr. Thomas Benton, a psychiatrist who was asked to submit a medical opinion in connection with Weber's application for VA disability benefits, diagnosed Weber with PTSD. Dr. Benton recorded Weber's statements that he self-isolated and also experienced flashbacks, nightmares, anhedonia, hypervigilance, and irritability. Dr. Benton further wrote that Weber exhibited anxiety, psychomotor slowing (a decrease in reaction time coupled with cognitive issues), emotional blunting, and poor judgment and concentration. He assessed a GAF score of 30, signaling severe difficulty with social functioning, and opined that Weber was unemployable.

Later, Weber sustained two head injuries. In early 2008, he was taken to the emergency room after a fight. A CT scan ruled out subacute bleeding. In mid-2009,

Weber tripped and hit his head. He experienced headaches and irritability but refused to go to the emergency room and later told a nurse over the phone that he was fine.

Meanwhile, Weber was admitted to a polytrauma clinic after screening positive for traumatic brain injury. He reported sleeping disorders, poor memory and concentration, headaches, and hypervigilance, among other symptoms. A physiatrist opined that his symptoms were consistent with traumatic brain injury and PTSD and ordered a neurological consult. A treatment team—consisting of the physiatrist, social workers, and a few others—sought to keep in touch with Weber and reduce his symptoms. But Weber's compliance with treatment was spotty. He canceled the neurological consult, for instance, and repeatedly refused mental-health treatment.

In 2010, Weber saw Dr. Benton again in connection with his VA benefits application. This time, he told Dr. Benton that he feared that taking medications for his symptoms would affect his judgment. Dr. Benton recorded Weber's complaints of continuing isolation, irritability, poor concentration, and flashbacks. For a second time, Dr. Benton assessed a GAF score of 30 and opined that Weber could not work.

Just a few days later, however, a social worker observed that Weber appeared to be doing well. Weber told the social worker that he was looking for work, helping out on his in-laws' farm, and coaching his stepson's soccer team.

The next year, the polytrauma team discharged Weber from the clinic after he scheduled no appointments for over a year. When a case manager called to discuss Weber's PTSD diagnosis, Weber said he was doing fine and again declined treatment.

Weber did not seek further treatment until 2015, when his wife took him to Dr. Joel Villegas, a private internist. Dr. Villegas diagnosed generalized anxiety disorder and prescribed diazepam. Meanwhile, Weber's wife told social workers that he lost his temper in public, had unstable moods, and forgot to take his medications. But Weber himself denied any symptoms beyond poor memory.

B

We next recount Weber's left-wrist restrictions. After Weber's reconstructive surgery in 2004, doctors observed that Weber's skin-graft donor site appeared to be healing well, though Weber reported decreased sensation and some swelling.

The record contains no complaints of left-wrist complications until mid-2007, when Weber reported limited dexterity in his left hand at a primary-care appointment.

Later that year, he saw Dr. Robert Novak, an orthopedist, for weakened grip in his left hand and pain in his left wrist. He rated the pain as "7/10." He struggled to dress himself and lift objects, he said, and experienced numbness in his fingertips. A Finkelstein test (used to diagnose De Quervain's syndrome, a painful condition affecting the tendons) was positive, meaning that Weber could not flex his fingers across his palm or move his wrist from side-to-side without pain. Otherwise, Weber had a normal range of motion and no significant weakness in his left wrist. Dr. Novak diagnosed Weber with De Quervain's syndrome, caused by scar tissue from the skin-graft donor site, and further opined that Weber's symptoms were consistent with compression neuropathy and nerve entrapment. But an electromyogram test in 2008 showed no nerve lesions.

Weber did not seek further treatment for his wrist until late 2011, when he banged it on a shopping cart. A month later, he said that he was recovering well and could play videogames with his son. Still, he started wearing a wrist immobilizer and later complained of additional left-wrist limitations. Those limitations, he says, have interfered with his physical therapy for other conditions; for instance in 2013, he had trouble holding a towel to assist in stretching exercises.

C

The procedural history leading to this appeal is lengthy. After applying for social security disability benefits in 2013, Weber submitted two subjective-report forms. In those forms, he reported difficulties with his left wrist but checked no boxes indicating problems with memory, concentration, following instructions, or social interactions. Among other activities, Weber said that he could still drive and shop. Further, he chatted on the computer daily, got along well with others, could take medications without reminders, had never been fired from a job, could remain attentive for hours, and sometimes went to a local Masonic lodge.

At a hearing before an ALJ in 2015, Weber testified that he was more limited than he had alleged in his subjective-report forms. He said, for instance, that he could no longer handle criticism or get along with supervisors and that he needed frequent reminders to take his medication and handle his other personal needs. Further, he told the ALJ that he was hypervigilant, got anxious around people, and self-isolated. His wife, for her part, testified that his moods were unstable and that he suffered frequent headaches that required him to lie down for hours.

The ALJ determined that Weber was not disabled and denied his application for social security benefits. The ALJ concluded that Weber suffered from several severe impairments, including traumatic brain injury and PTSD. But his refusal to seek more treatment, plus his activities—such as coaching a soccer team and working on his in-laws' farm—suggested that he was not as limited as he alleged. The ALJ assessed Weber as having the residual functional capacity, or RFC, to perform sedentary work with some restrictions. Based on a vocational expert's testimony, Weber was still employable. The Appeals Council remanded the case back to the ALJ for further consideration, however, asking for a more detailed evaluation of Weber's RFC and the fear of medication that Weber expressed to Dr. Benton.

After a second hearing in 2017, the ALJ again denied Weber's application and declined to assess further limitations for the same reasons as he had previously. Even if Weber was as limited in 2007 and 2010 as Dr. Benton described, the ALJ added, nothing about Weber's later treatment suggested that his limitations continued through the date of his application for benefits. The Appeals Council remanded for a second time. This time, it criticized the ALJ for overstating Weber's activities, not adequately evaluating Weber's GAF scores, and not "clearly explain[ing] how the mental limitations were related to [Weber's] moderate limitations in concentrating, persisting, or maintaining pace."

Weber then had a third hearing before a new ALJ in 2019, during which he added little to his prior testimony. When the vocational expert testified, the ALJ asked the expert to consider whether an individual limited to the following RFC was employable:

> [F]requent handling and fingering with his non-dominant left upper extremity… [who] could understand, remember, and carry out simple instructions; make simple work-related decisions; and tolerate no more than brief, superficial interactions with supervisors and co-workers, no tandem work, and no interaction with the public.

The vocational expert responded that such an individual could work as a polisher, sorter, and assembler. But these positions would not be available to an individual who was off-task for more than 10% of a workday, had unscheduled absences, or displayed emotional outbursts. Nor would such positions accommodate an individual who was limited to occasional handling with his left hand.

For a third time, Weber's application was denied. The new ALJ determined that Weber suffered degenerative joint disease in his left wrist and had severe mental impairments that caused moderate limitations in several functional areas. But the ALJ adopted the RFC that she had posited to the vocational expert and further found that Weber would not be off-task beyond tolerated amounts.

In declining to assess further limitations, the ALJ noted that Weber reported no social or cognitive limitations in his subjective reports from 2013. She also concluded that his allegations of more severe restrictions were undermined by the nature of the activities he said he could still perform—shopping, working on his in-laws' farm, and looking for work. Weber consistently refused treatment, the ALJ pointed out, and doctors apparently acceded to those decisions. Further, Weber repeatedly screened negative for PTSD during the relevant period. The ALJ saw no evidence of ongoing treatment or trouble accessing care, nor did the ALJ credit Weber's concerns about taking medications. According to the ALJ, Dr. Benton's opinion deserved little weight because he had evaluated Weber only twice. As for Weber's left wrist, the ALJ observed that he had sought little treatment. Electromyogram results from 2008 did not show nerve damage, and Weber's other examinations revealed largely normal results.

The district court upheld the ALJ's denial of benefits, and this appeal followed.

## II

In this case, because the Appeals Council did not assume jurisdiction over the latest ALJ's decision, that ALJ's ruling is the final decision of the Commissioner of Social Security. See 20 C.F.R. § 404.984. Accordingly, this court reviews de novo the district court's order affirming the Commissioner's final decision, "meaning we review the [last] ALJ's ruling directly." *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009). The court will uphold the ALJ's denial of benefits "if it is supported by substantial evidence." *Id.* "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)).

## A

Weber first contends that substantial evidence does not support the ALJ's assessment of his mental RFC. He argues, for instance, that the ALJ identified no medical evidence supporting her conclusion that he could perform simple tasks for an

entire workday. Despite two prior remands by the Appeals Council criticizing the lack of medical evidence supporting the RFC, he says, the ALJ obtained no additional medical opinions and instead "forg[ed] ahead with her independent assessment" of the interaction between Weber's PTSD and his traumatic brain injury.

As the claimant, however, Weber bore the burden of establishing his disability. *Scott v. Astrue,* 647 F.3d 734, 741 (7th Cir. 2011). He does not dispute that the ALJ gave adequate reasons for rejecting Dr. Benton's opinions about his limitations, and no other doctor has opined that Weber has greater limitations than those found by the ALJ. See *Rice v. Barnhart,* 384 F.3d 363, 370 (7th Cir. 2004). Meanwhile, Weber submitted conflicting evidence regarding the severity of his PTSD and his traumatic brain injury: He has told medical providers that his symptoms are both disabling and well-managed. Weighing conflicting evidence is exactly what the ALJ was required to do in assessing Weber's disability claim. See *Young v. Barnhart,* 362 F.3d 995, 1001 (7th Cir. 2004). Based on Weber's inconsistent reports of his own symptoms, his repeated refusals to seek more aggressive treatment, and his accounts of activities he says that he could still perform, the ALJ permissibly concluded that Weber was not as limited as he alleged. Contrary to Weber's assertions, that conclusion is not an improper medical determination but "is the type of context consideration that judges routinely make when assessing the weight to attribute to conflicting evidence." *Id.* Weber does not identify a single piece of evidence that the ALJ failed to discuss. And we lack authority to reweigh the evidence and substitute the ALJ's decision for our own. *Chavez v. Berryhill,* 895 F.3d 962, 968 (7th Cir. 2018).

Weber suggests only that the ALJ should have accorded more weight to his testimony about poor memory and social anxiety and reasons for not seeking more treatment. An ALJ's findings concerning the intensity, persistence, and limiting effects of a claimant's symptoms must be explained sufficiently and supported by substantial evidence. See *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011); see also *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015) (an ALJ must "adequately explain his or her credibility finding by discussing specific reasons" supported by the record). So long as the ALJ issues a reasoned explanation, we "will not overturn [the] ALJ's credibility determination unless it is patently wrong." *McKinzey*, 641 F.3d at 890 (internal citations omitted); see also *Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2008). "Patently wrong" is a high threshold—"only when the ALJ's determination lacks any explanation or support … will [we] declare it to be patently wrong and deserving of reversal." *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008) (internal citations omitted).

We cannot say that the ALJ's credibility determinations were patently wrong. As discussed above, the record sufficiently supports the ALJ's conclusion that Weber's allegations of severe limitations are not entirely consistent with the other evidence—normal examinations, unremarkable findings from imaging tests, and Weber's own reports of activities he still can perform. Moreover, as the ALJ noted, there is no record of any doctor advising Weber of potentially adverse effects of medication, nor is there any indication that Weber ever sought more aggressive treatment for PTSD or his traumatic brain injury. To the contrary, Weber consistently refused treatment, and he was apparently discharged from the polytrauma clinic *because* he sought no treatment, despite social workers reaching out to him repeatedly to schedule appointments.

Weber further contends that the ALJ failed to adequately explain how her RFC assessment accounted for his limitations in "concentration, persistence, and pace," despite recognizing his "moderate" limitations in that area. In this regard, Weber asserts that the ALJ's decision is internally inconsistent and lacks a narrative discussion of how the record supports the assessed RFC. See SSR 96-8p, 61 Fed. Reg. 34474, 34478 (July 2, 1996) (explaining narrative discussion requirements for an RFC assessment). But an ALJ need not use any "magic words" in an RFC assessment; we will not reverse so long as the assessment "incorporate[s] all of the claimant's limitations supported by the medical record." *Crump v. Saul,* 932 F.3d 567, 570 (7th Cir. 2019) (internal citations omitted). And there is no categorical rule that an ALJ may never accommodate "moderate" limitations in concentration, persistence, and pace with only a restriction to simple tasks. *Lothridge v. Saul,* 984 F.3d 1227, 1234 (7th Cir. 2021).

Here, the ALJ considered nearly all the available evidence before concluding that Weber still could perform sedentary work if limited to "simple work-related decisions [and] no more than brief, superficial interactions with supervisors and co-workers." In arguing that the ALJ failed to provide a narrative discussion supporting her assessment, Weber overlooks the ALJ's statements that she considered his "moderate" limitations in concentration, pace, and persistence. Further, the ALJ provided an extensive narrative which included discussing Weber's job searches, his family activities, and his work on his in-laws' farm, before expressly finding that Weber would not be absent or off-task in excess of what would be tolerated. The ALJ's decision was supported by substantial evidence.

B

Weber also contends that the ALJ failed to adequately explain her finding that he retained the ability to "frequently" use his left hand for handling and fingering. He

argues that the ALJ gave no indication that she was aware of the shrapnel wounds to his left arm or permanent nerve damage associated with a skin graft. Further, he says, the ALJ ignored evidence that he had greater limitations with his left hand—such as his struggles with grip that impeded his physical therapy outside of his insured status—and the ALJ made an improper medical determination by interpreting Dr. Novak's test results and the 2008 electromyogram on her own.

But the ALJ both acknowledged the skin graft procedure and thoroughly discussed Weber's objective examinations from the relevant period, which were largely normal. Further, doctors reported that the skin-graft donor site appeared to be well-healed despite sometimes being swollen, and electromyogram results from 2008 revealed no significant abnormalities. Weber also did not seek any additional treatment for his wrist until he banged it on a cart in 2011. A mere month after that injury, he reported that his condition was improving and that he was able to play videogames with his stepson. We have considered Weber's later complaints about his left-wrist impairments, and find that substantial evidence supports the ALJ's conclusion that Weber had no greater left-wrist impairments at the time of those complaints than on the date he was last insured.

AFFIRMED