In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2702

RONALD M. ENGSTRAND,

*Plaintiff-Appellant,*

*v.*

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 13-cv-436-bbc — **Barbara B. Crabb**, *Judge.*

ARGUED APRIL 28, 2015 — DECIDED JUNE 4, 2015

Before FLAUM, KANNE, and WILLIAMS, *Circuit Judges.*

FLAUM, *Circuit Judge.* Ronald Engstrand, a 52-year-old former dairy farmer, applied for Disability Insurance Benefits and Supplemental Security Insurance because of pain caused by his diabetic neuropathy and osteoarthritis. After a hearing, an administrative law judge ("ALJ") concluded that Engstrand is not disabled. The ALJ reasoned that Engstrand's account of his limitations is not credible and

that his treating physician is not entitled to deference. The Appeals Council denied review, and the district court upheld the ALJ's decision. For the reasons set forth below, we reverse the district court's judgment and remand the case to the agency for further proceedings.

## I. Background

Engstrand applied for benefits in July 2010, when he was 47. He alleged an onset of disability in July 2007, more than a year before his date last insured in September 2008.

After graduating from high school in 1981, Engstrand worked as a dairy farmer. Most days he worked from 6:00 a.m. until late at night. In 2003 he was diagnosed with diabetes. By 2007 he no longer could handle the rigorous farming life, so he sold his cows. Since then he has not worked full-time.

Engstrand was treated for his diabetes by Dr. Thomas Retzinger from 2009 to 2012. At the outset Dr. Retzinger noted that Engstrand could easily detect a 10-gram monofilament[1] and still had "good sensation and circulation" even though his diabetes previously had been "uncontrolled." Dr. Retzinger prescribed several medications to lower Engstrand's cholesterol and blood sugar. Then in 2010, Engstrand's diabetes symptoms began to multiply.

---

[1] A 10-gram monofilament is a soft nylon fiber used to test sensitivity to touch. A person who cannot feel the monofilament may have neuropathy severe enough to lead to an ulcer or gangrene. *See* STEDMAN'S MEDICAL DICTIONARY 1313 (28th ed. 2006); *Diabetic Neuropathy Tests and Diagnosis*, MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/diabetic-neuropathy/basics/tests-diagnosis/con-20033336 (last visited May 20, 2015).

Dr. Retzinger documented polyuria (excessive urine production), nocturia (waking up at night to urinate), polydipsia (excessive thirst), polyphagia (excessive hunger), weight loss, vision problems, and pain in Engstrand's lower extremities. Engstrand's sporadic use of prescription pills had not controlled these serious symptoms, so Dr. Retzinger decided that regular insulin injections were necessary. According to Dr. Retzinger's notes, Engstrand took the insulin and checked his blood sugar regularly. Dr. Retzinger later increased the insulin dosage but noted that Engstrand's blood sugar remained very high. The physician also consistently documented Engstrand's continuing struggle with neuropathy and noted that he experienced "diminished" and burning sensations in his feet.[2] Dr. Retzinger also continued to note Engstrand's ability to perceive a 10-gram monofilament. At one point Engstrand told Dr. Retzinger that his feet hurt so much that walking in bare feet on a smooth floor felt like walking on gravel, but at another appointment Dr. Retzinger recorded that Engstrand felt "fine" and appeared "quite well." Engstrand also reported hip and knee pain, and an X-ray revealed mild osteoarthritis in his right hip and knee. Dr. Retzinger prescribed two painkillers;

---

[2] "Diabetic neuropathy" is a generic term for any diabetes-related disorder that affects the nerves, and it is the most common chronic complication of diabetes. Neuropathies can cause burning or sharp pain, a diminished capacity for physical sensation, an abnormal increase in sensitivity to touch, tingling skin ("falling asleep"), muscle weakness, ulcers, infections, and loss of reflexes, balance, coordination, temperature, and vibratory sense. The development of diabetic neuropathy is poorly understood, and the response to treatment is unpredictable. *See* STEDMAN'S MEDICAL DICTIONARY 1313 (28th ed. 2006); *Diabetic Neuropathy Symptoms*, MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/diabetic-neuropathy/basics/symptoms/con-20033336 (last visited May 20, 2015).

Engstrand took one as needed but found the other "intolerable." Dr. Retzinger eventually discontinued certain medications since Engstrand was "not much of a pill taker" and "cost issues" were a concern for him.

Dr. Retzinger reported Engstrand's residual functional capacity ("RFC") on a standard Social Security Administration form in July 2010. Dr. Retzinger concluded that Engstrand could lift 25 pounds frequently but only occasionally lift 50 pounds. Dr. Retzinger also concluded that during an eight-hour workday Engstrand could not stand or walk for more than two to six hours total. And, the doctor said, Engstrand must alternate between standing and sitting to relieve his pain. He also should limit using his lower extremities to push or pull and should not climb, kneel, crouch, crawl, or stoop, except occasionally. Finally, Dr. Retzinger opined, Engstrand must minimize his exposure to extreme temperatures, vibrations, humidity, and hazards, all of which could aggravate his neuropathy symptoms.

In September 2010 a state-agency physician, Janis Byrd, reviewed Engstrand's medical records. She generally agreed with Dr. Retzinger's assessment of Engstrand's RFC, except that Dr. Byrd thought Engstrand could push and pull without limit. Dr. Byrd explained that both neuropathy and osteoarthritis likely would produce Engstrand's reported symptoms, and she deemed him credible because those symptoms correlate to his stated limitations and Dr. Retzinger's assessment. Yet that same day, the Social Security Administration denied Engstrand's request for benefits. He sought reconsideration.

Around this time Engstrand completed two written self-assessments of his level of functioning: one in August 2010 and the other in January 2011. In each he describes a typical day: He drives his wife to work around 5:30 or 6:00 a.m., lies down until helping their six children get ready for school beginning at 7:00 a.m., spends two or three hours at his parents' farm feeding the few cattle his children raise for 4-H (his children accompany him and perform that task during the summer), prepares lunch at home, picks up his wife from work in the afternoon, helps prepare dinner, and after dinner returns to his parents' farm with his children to care for their cattle. He also drives the children to sports and shops for groceries two to four times a month. Engstrand recounts in these self-assessments that his joints ache, his feet are tender, walking is painful, and sometimes his leg pain keeps him awake at night. Some days are worse than others, and on bad days his legs "hurt like hell." He estimates that he can sit continuously for two to four hours, stand continuously for two to three hours, and walk without a break for half an hour.

A second state-agency physician, Syd Foster, reviewed Engstrand's medical records in February 2011. Unlike Dr. Retzinger and Dr. Byrd, Dr. Foster concluded that Engstrand could perform "medium" work so long as the jobs did not involve constant kneeling or crouching or significant exposure to heat, cold, and humidity. Dr. Foster also concluded that Engstrand could frequently lift 25 pounds, push and pull without limit, and sit, stand, or walk for six hours total in an eight-hour workday. Dr. Foster thought it significant that Engstrand "was still able to detect a 10-gram filament in the feet" and purportedly walked with a "normal gait" despite complaining about "burning pain in

the feet and legs." Moreover, Dr. Foster thought Engstrand
had become better at controlling his glucose, and his neu-
ropathy was not worsening. Dr. Foster added that, in his
view, Engstrand's condition actually had improved since he
applied for benefits and his statements about his level of
pain were inconsistent. The doctor opined that Engstrand
lacks credibility and said he would "not give controlling
weight to Dr. Retzinger's opinion." The day after Dr. Foster's
report, Engstrand's request for reconsideration was denied.

Engstrand then testified before an ALJ in February 2012.
He stated that he takes insulin three times daily as pre-
scribed and his pain medications as needed. Still, he said,
since 2007 he had been unable to work full-time and because
of his pain no longer could stand continuously for more than
30 minutes or carry more than 20 to 50 pounds. He also stat-
ed that he helps on his parents' farm a few times a week
(with tasks like picking up hay bales with a tractor), but his
teenage children care for their own cattle and help him do
any major physical work. He said that he constantly feels
tight and stiff and always wears shoes at home because even
a tiny crumb feels like a pin when he walks barefoot. Stand-
ing for more than 30 minutes causes pain in his legs, right
hip, and right knee. And after 30 minutes of continuous
sitting his right knee locks and his leg muscles cramp. To
minimize this pain, he lies down and rubs his legs for about
two hours every afternoon.

A vocational expert ("VE") was the only other witness.
The ALJ asked about work available to a high school gradu-
ate of Engstrand's age who is capable of medium exertion
involving infrequent kneeling or crouching in an environ-
ment free of extreme heat, cold, or humidity. The stated limi-

tations would rule out Engstrand's past work, the VE replied, but still would allow for work as a security guard, surveillance-system monitor, ticket taker, or cashier. More than 86,000 of these positions, the VE added, are available in the "local economy." The VE acknowledged, though, that only the job of surveillance-system monitor (with 1,300 positions) can be performed by someone who must avoid vibrations and unprotected heights; cannot kneel, crouch, climb, crawl, or stoop except occasionally; is required to alternate between sitting and standing; and cannot stand or walk for more than two hours total in an eight-hour workday. And, the VE conceded, a need to lie down for two hours during a workday would eliminate all full-time jobs.

The ALJ found Engstrand not disabled. Applying the requisite five-step analysis, *see* 20 C.F.R. §§ 404.1520(a), 416.920(a), the ALJ found that (1) Engstrand had not engaged in substantial gainful activity since his alleged onset date, (2) he suffers from severe diabetes mellitus with early neuropathy and mild osteoarthritis of his right hip and knee, (3) these impairments do not meet the criteria for presumptive disability, (4) Engstrand cannot perform his past work but has the RFC to perform medium work with limitations, and (5) jobs of that type are available. In siding with Dr. Foster, one of the two state-agency physicians, the ALJ rejected the opinions of both Engstrand's treating physician, Dr. Retzinger, and the other state-agency physician, Dr. Byrd. The ALJ gave no reason for rejecting Dr. Byrd's opinion but said that Dr. Retzinger's opinion contradicts his own treatment notes. The ALJ also disbelieved Engstrand's own account of his limitations and declared his testimony inconsistent with the "objective medical signs and laboratory findings."

The ALJ offered multiple reasons for finding Engstrand not credible. For example, the ALJ was critical that Engstrand had not undergone an EMG or nerve-conduction study to verify his neuropathy, and she deemed it "most significant" that, despite Engstrand's testimony about foot pain, he could still detect a 10-gram monofilament. The ALJ also noted that Dr. Retzinger had attributed Engstrand's limitations to the neuropathy, but, the ALJ declared, Engstrand had been filling his prescriptions for pain medication only for osteoarthritis, not neuropathy. Furthermore, the ALJ insisted, Engstrand had been "only partly compliant with treatment" and yet had not experienced episodes of hypoglycemia (low blood sugar), diabetic ketoacidosis (production of excess blood acids), or diabetic retinopathy (damage to blood vessels in the retina). Additionally, the ALJ asserted that Engstrand's "blood glucose and overall condition" had become "well-controlled" with increased insulin. The ALJ also disbelieved that Engstrand could be experiencing significant pain or have "time for 2-hour naps" given what she characterized as his "rather extensive responsibilities" and "fairly impressive array of active daily activities." Finally, the ALJ noted that at the time of the hearing Engstrand's children ranged in age from six to sixteen, and she speculated that Engstrand "may have had motivations not to work full-time other than simply an inability to do so, and that being specifically related to childcare."

## II. Discussion

Before this court Engstrand challenges only the ALJ's adverse credibility finding, arguing that the ALJ improperly discredited his testimony of disabling pain and wrongly equated his sporadic physical activities with the ability to

work full-time. He asserts that his testimony that he must lie down for two hours every day, if credited, would mean that he is disabled. *See Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008).

Because the Appeals Council denied review, we evaluate the ALJ's decision as the final word of the Commissioner. *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). For us to uphold that decision, it must rest on substantial evidence, *Pepper v. Colvin*, 712 F.3d 351, 361–62 (7th Cir. 2013), untainted by an erroneous credibility finding, *Murphy v. Colvin*, 759 F.3d 811, 815–16 (7th Cir. 2014). And although we defer to an ALJ's credibility finding that is not patently wrong, *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015), an ALJ still must competently explain an adverse-credibility finding with specific reasons "supported by the record," *Minnick*, 775 F.3d at 937. "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014).

After reviewing the record, we conclude that the ALJ's credibility finding here is patently wrong. First, as Engstrand argues, his complaints of severe pain stemming from his neuropathy need not be confirmed by diagnostic tests. *See* SSR 97-6p(4); *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015); *Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015). And there is no indication that a doctor ever recommended an EMG or nerve-conduction study that the ALJ thought would have been appropriate. Moreover, the ALJ assumed that, because Engstrand could feel the 10-gram monofilament, he must be lying about his neuropathy, but there is no evidence

that the two are mutually exclusive. The 10-gram monofilament test is used to determine whether a person has neuropathy so severe as to cause an ulcer or gangrene, *see* STEDMAN'S MEDICAL DICTIONARY 1313 (28th ed. 2006), and there is no evidence in the record supporting the ALJ's belief that Engstrand's ability to feel the monofilament contradicts his complaints of pain. The test does not measure pain; rather, it is designed to alert a clinician that a patient who cannot detect the pressure of the monofilament has lost nerve function. *See* Jacquelien Dros et al., *Accuracy of Monofilament Testing to Diagnose Peripheral Neuropathy: A Systematic Review*, 7 ANNALS OF FAMILY MEDICINE 555, 556 (2009); Andrew J.M. Boulton et al., *Comprehensive Foot Examination and Risk Assessment*, 31 DIABETES CARE 1679, 1680 (2008). Dr. Retzinger regularly documented both Engstrand's reports of pain and his ability to detect a 10-gram monofilament, and thus the treating physician obviously did not think them inconsistent. And not even Dr. Foster (whose opinion the ALJ said she relied on) explicitly linked the monofilament test to a measurement of pain; he placed in the same sentence his observations about Engstrand's complaints of pain and Engstrand's ability to feel the monofilament, but he did not say that any correlation existed between these observations. Rather, the ALJ apparently assumed a connection. Thus, in deciding that the two were mutually exclusive, the ALJ was inappropriately "playing doctor." *See Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (rejecting ALJ's interpretation of MRI results); *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (noting that ALJs must "rely on expert opinions instead of determining the significance of particular medical findings themselves").

Next, the ALJ improperly relied on Engstrand's sporadic use of medications. First, the ALJ purportedly gleaned from "treatment notes" that Engstrand was refilling his pain medication for osteoarthritis instead of neuropathy, but we cannot find support for that conclusion in the treatment notes. More importantly, the ALJ does not say why this would matter. An ALJ must "consider an applicant's medical problems in combination," *Goins*, 764 F.3d at 681, and we cannot understand why Engstrand's credibility would be diminished simply because he suffers pain from both neuropathy *and* osteoarthritis. Additionally, the ALJ concluded that Engstrand's condition had improved when he complied with his prescribed treatment—this conclusion appears to be based solely on one treatment note where Engstrand reported feeling "fine"—but she did not inquire of Engstrand why he may have been less than fully compliant. *See Murphy*, 759 F.3d at 816; *Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013); *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013). Indeed, Engstrand had told Dr. Retzinger that one of the medications was "intolerable," and he stopped taking other medications due to "cost issues." Engstrand also had reported that some days he felt worse than others, so the fact that Dr. Retzinger recorded that he felt "fine" at one appointment does not weaken the rest of his testimony about disabling pain.

Furthermore, as Engstrand contends, the ALJ wrongly evaluated the significance of his daily activities. First, the ALJ conflated Engstrand's 2010 and 2011 self-reports of daily activities with his 2012 testimony, and she should have considered the possibility that his pain had worsened—and thus activities differed—over time. *See Pierce*, 739 F.3d at 1051. But, more significantly, Engstrand's reported activities were quite consistent with his testimony that he cannot stand for

very long without pain and that he needs to frequently alternate between sitting, standing, and lying down. Engstrand said he drives his wife to work and his children to sports, and he helps with seated tasks (such as driving a tractor) at his parents' farm, where his children do all of the significant physical tasks. The ALJ suggested that Engstrand is a "part-time farmer" but failed to understand that working sporadically or performing household chores are not inconsistent with being unable to engage in substantial gainful activity. *Scrogham v. Colvin*, 765 F.3d 685, 700 (7th Cir. 2014); *see also Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014) (ALJs must recognize that "full-time work does not allow for the flexibility to work around periods of incapacitation"); *Roddy*, 705 F.3d at 638 (claimant who "pushed herself to work part-time and maintain some minimal level of financial stability, despite her pain," was not precluded from establishing disability). Additionally, the ALJ disbelieved Engstrand's testimony that, in the midst of these activities, he has to lie down for two hours every day, but his reports of functioning and his testimony left several open hours each afternoon during which he could indeed find time to lie down. And the ALJ made no attempt during the hearing to explore those possibilities. *See Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014). Moreover, there is no evidence in the record to support the ALJ's seemingly unwarranted conjecture that Engstrand had stopped working not because of disability but because of "childcare," nor did the ALJ attempt to question Engstrand about his motivations to stop working. *See Murphy*, 759 F.3d at 817.

Finally, although Engstrand does not challenge the ALJ's refusal to give the opinion of his treating physician controlling weight, the ALJ's flawed credibility finding hindered

her ability to appropriately weigh other favorable evidence, including Dr. Retzinger's opinion. *See Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014) (explaining that we have "repeatedly forbidden" ALJs from cherry-picking only the medical evidence that supports their conclusion); *Moore*, 743 F.3d at 1124 ("The ALJ simply cannot recite only the evidence that is supportive of her ultimate conclusion without acknowledging and addressing the significant contrary evidence in the record."). Dr. Retzinger consistently recorded Engstrand's neuropathy and his reports of pain—despite his regimented insulin usage—and the doctor deemed that pain serious enough to prescribe several medications and to recommend that Engstrand walk or stand only a few hours total in an eight-hour workday. As the treating physician, Dr. Retzinger's opinion should have controlled over the conclusions of the agency doctor who did not examine Engstrand, unless the ALJ could persuasively explain why Dr. Retzinger's opinions about Engstrand's serious limitations were not supported by the record. *See* 20 C.F.R. § 404.1527(c); *Minnick*, 775 F.3d at 937–38; *Roddy*, 705 F.3d at 636–37. And as we have discussed, the ALJ neglected to do so. Moreover, the ALJ gave no explanation (let alone support with substantial evidence, *see Scrogham*, 765 F.3d at 695) for rejecting the opinion of Dr. Byrd (an agency physician), which highlights her questionable dismissal of Dr. Retzinger's opinion.

### III. Conclusion

For the above reasons, we reverse the district court's judgment and remand this case to the Commissioner for further proceedings.