In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-2333

RILEY FORSYTHE,

*Plaintiff-Appellant,*

*v.*

CAROLYN W. COLVIN, Acting Commissioner of Social
Security,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:14-CV-509-bbc — **Barbara B. Crabb**, *Judge.*

ARGUED JANUARY 27, 2016 — DECIDED FEBRUARY 17, 2016

Before POSNER, KANNE, and HAMILTON, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff applied to the Social
Security Administration for disability benefits and was
turned down by the administrative law judge who heard his
case, and who ruled that although the injuries that the plain-
tiff claimed had rendered him totally disabled from gainful
employment were severe, he was not totally disabled be-

cause he could, the administrative law judge decided, perform certain unskilled sedentary jobs. The district court affirmed the decision, and the plaintiff now appeals to us.

He has a long history of injuries. They include a 1998 dislocation of a kneecap that required implantation of a steel plate, and a year later a shattered femur that required implantation of a steel rod from hip to knee. In 2011 he fractured an ankle, and a podiatrist named Eckerman inserted a bar with pins in the ankle to stabilize the fracture. Eckerman repeated the procedure, with better results, three months later. But after several months, during which the plaintiff "picked up his activity level significantly," his ankle pain returned and he was prescribed Vicodin and Percocet, strong drugs, which however gave him only brief, limited relief. While in January and February 2012 he said he was 60 to 70 percent better and his ankle was "not giving him a significant amount of difficulty right now," severe pain and swelling in the affected ankle returned and in April Eckerman reported that "persisting pain" was keeping the plaintiff from walking "more than 10 minutes at a time" or standing for "long periods of time." He listed the plaintiff's ankle problems as "painful impacted hardware," tendinitis (inflammation of a tendon), paresthesias (a burning or prickling sensation), and possibly neuralgia (sharp nerve pain). In May and June Eckerman along with another doctor who had treated the plaintiff, named Logan, reported that the plaintiff could sit, stand, and walk for only 15 minutes at a time and for no more than one hour in an eight-hour work day; that he could lift a weight of 10 pounds (according to Logan) and 20 pounds (according to Eckerman) only occasionally; and that he could not reach up with his right arm at all.

Several months later Logan reported that the plaintiff was "fully and completely disabled" because he had constant and worsening pain in his back, left knee, left hip, left ankle, and right shoulder, that his pain medication had caused him to experience constipation, slow bowels, drowsiness, and upset stomach, and that his prognosis was "poor."

The administrative law judge denied the plaintiff's claim for disability benefits mainly on the ground that the doctors' medical records were at variance with their reports. An x-ray taken in May 2012 showed that the plaintiff's ankle fracture had healed, and Eckerman reported in the summer of that year that the ankle injury was "certainly better" and had a "good/fair" prognosis, and that the plaintiff was "on [the ankle] quite a bit." Yet the plaintiff still had pain, which Eckerman attributed to the ankle hardware and to tendinitis. And Logan reported in September that the plaintiff had "decreased mobility, joint tenderness, popping and swelling," and "crepitus" (a sound produced by the rubbing together of bone).

Now it's true that by February 2013 the plaintiff was walking and even lifting weights—though we're not told how heavy the weights were. And later that month the hardware was removed from the plaintiff's ankle—the third surgery on the ankle—and Eckerman reported that the plaintiff was improving and managing pain well. Yet in a letter that he sent shortly after the third surgery we read that the plaintiff "may not return to work at this time. Activity is restricted as follows: off work due to foot surgery and being non-weight bearing." Weeks later, it is true, Eckerman reported that although the plaintiff was "using an assistive device [not defined]" for activity, he was "improving," had

"very little pain and swelling" and a "full active range of
motion," and was "not taking any pain medication." And
therefore (Eckerman added) his "work status is light
work/activity." As the administrative law judge said, the
plaintiff was "less symptomatic" after the third surgery. But
at his hearing before the administrative law judge the plain-
tiff testified that he still had severe pain. His doctors pre-
scribed pain relief; he was taking Hydrocodone, a powerful
narcotic pain reliever.

In addition to testimony by the two doctors and the med-
ical records we've been quoting from, the plaintiff testified
that he had "constant" knee pain that "never goes away,"
that his pain averaged 6 on a scale of 10 where 10 would re-
quire that he be taken to a hospital emergency room, that he
could not walk a full block, could not stand for more than
eight minutes at a time or sit for more than twenty minutes,
couldn't climb a flight of stairs, and did very little at home
other than wake his son for school, wash dishes, sweep the
floor, vacuum, and do laundry.

Regarding the plaintiff's complaints of continued pain,
the administrative law judge noted that his ankle fracture
had improved and his pain had lessened, and gave little
weight to the two doctors' assessments of the plaintiff's abil-
ity to work, again emphasizing the improvement in his con-
dition. He also deemed the two doctors' assessments incon-
sistent with the plaintiff's description of his activities of dai-
ly living. There he clearly was mistaken; there was no incon-
sistency. The plaintiff testified without contradiction, or re-
jection by the administrative law judge, that he does "very
little" at home other than the chores listed above. Moreover,
extrapolating from what people do at home, often out of ne-

cessity, to what they could do in a 40-hour-a-week job is per-ilous. At home one has much greater flexibility about when and how hard and how continuously to work; one can rest during the day (which one can't do in a 9-to-5 job); and sheer necessity may compel one to perform tasks at home no mat-ter how painful, such as taking care of one's child. See *Eng-strand v. Colvin*, 788 F.3d 655, 661–62 (7th Cir. 2015); *Scrogham v. Colvin*, 765 F.3d 685, 700 (7th Cir. 2014); *Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014); *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009).

The plaintiff testified that "I currently am restricted … because [ ] all the metal and stuff in my body is restraining me from being on my feet for eight hours or sitting for eight hours. And I currently cannot find a job that suits where I would be able to accommodate to sit or stand for long peri-ods of time." Although the administrative law judge ruled that the plaintiff is not totally disabled, he gave no reason for thinking that the plaintiff could actually work for eight hours a day, forty hours a week, missing no more than a couple of days a month—yet without such capacities he would be deemed totally disabled from gainful employment and therefore entitled to social security disability benefits. The administrative law judge seemed not to understand that the question he had to answer was not whether the plaintiff was less disabled than he had been four years ago, but whether he was sufficiently recovered to be able to hold down a 40-hour-a-week job outside the home.

Evidence that he was able may seem to have been con-tained in Eckerman's final report, quoted earlier, which states that the plaintiff was "improving," had "very little

pain and swelling" and a "full active range of motion," and was "not taking any pain medication," and so his "work status is light work/activity." But the administrative law judge did not mention that report. He also ignored two medical reports from 2012 (the year before the disability hearing) which said that the plaintiff suffered from "persistent pain," difficulty walking "more than 10 minutes at a time," tendinitis, nerve pain, and "painful impacted hardware." This was some months before the operation to remove the hardware in his ankle, and so may not cast much light on his current condition. But the administrative law judge did not say that, because, as we just said, he ignored the reports completely.

We have said enough to show that the administrative law judge's decision did not deal adequately with the evidence, and the district judge's affirmance of the decision must therefore be reversed with directions to remand the case to the Social Security Administration. But there is more that is problematic in the decision, and though it has not been made an issue by the plaintiff's lawyer we think it deserves brief mention for future reference.

The administrative law judge determined (though as we've seen without adequate basis in the record) that the plaintiff's femur fracture, ankle fracture, knee arthroscopy (a surgical procedure), and the injury to his shoulder that prevented him from raising his arm, did not disable him from performing certain sedentary jobs. In so concluding he relied on the testimony of a vocational expert that someone with the plaintiff's impairments could nevertheless work full time as a sedentary unskilled production worker, a sedentary unskilled information clerk, or a sedentary unskilled cashier, and that in Wisconsin, where the plaintiff lives, there are

1000 sedentary unskilled production worker jobs, 1000 sedentary unskilled information clerk jobs, and 2000 sedentary semiskilled (which he equated to unskilled) cashier jobs. But no effort was made by the vocational expert or the administrative law judge to explain what kind of work a sedentary unskilled production worker or information clerk does, or where the vocational expert had obtained the suspiciously round numbers of 1000, 1000, and 2000 of each type of job in Wisconsin. They sound like guesses. He did not explain what an "information clerk" does, or give any examples of production jobs he thought the plaintiff could perform.

That the administrative law judge gave no real consideration to the question what jobs the plaintiff can perform is shown by the fact that right after noting that the vocational expert had said that although the Dictionary of Occupational Titles classifies cashier jobs as semi-skilled the Dictionary is out of date and that he was reclassifying those jobs as unskilled, the administrative law judge said: "the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." So the administrative law judge wasn't paying attention.

The inadequacy of vocational expert testimony has been remarked in a number of decisions by this and other courts, and by informed commentators. See *Herrmann v. Colvin*, 772 F.3d 1110, 1112–14 (7th Cir. 2014); *Browning v. Colvin*, 766 F.3d 702, 708–09 (7th Cir. 2014); *Brault v. Social Security Administration*, 683 F.3d 443, 446–47, 447 n. 4 (2d Cir. 2012) (per curiam); *Guiton v. Colvin*, 546 F. App'x 137, 143–45 (4th Cir. 2013) (Davis, J., concurring); *Coppernoll v. Astrue*, No. 08-CV-382-BBC, 2009 WL 1773132, at *8, *12–13 (W.D. Wis. June 23, 2009); Jon C. Dubin, "Overcoming Gridlock: *Campbell* After a

Quarter-Century and Bureaucratically Rational Gap-Filling in Mass Justice Adjudication in the Social Security Administration's Disability Programs," 62 *Administrative Law Review* 937, 964–71 (2010); Peter J. Lemoine, "Crisis of Confidence: The Inadequacies of Vocational Evidence Presented at Social Security Disability Hearings (Part II)," *Social Security Forum*, Sept. 2012, p. 1. The basic problem appears to be that the only reliable statistics concerning the number of jobs in the American economy and in regions thereof are census data of broad categories of jobs, rather than data on the number of jobs within the much narrower categories of jobs that the applicant for benefits could actually perform. Often the vocational expert simply divides the census data on the number of jobs in the broad category that includes the narrow category of jobs that the applicant can perform by the total number of narrow categories in the broad category, thus assuming that each narrow category has the same number of jobs—an unwarranted assumption.

The vocational experts and administrative law judges can't be blamed for the poverty of the data concerning jobs that applicants for social security disability benefits are capable of performing. It is high time that the Social Security Administration turned its attention to obtaining the needed data.

REVERSED AND REMANDED, WITH INSTRUCTIONS