NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 16, 2016
Decided February 9, 2017

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 16-1745

| | |
|---|---|
| DANIEL W. KEYS, *Plaintiff-Appellant,* | Appeal from the United States District Court for the Northern District of Indiana, Fort Wayne Division. |
| *v.* | No. 1:14-cv-250 |
| NANCY BERRYHILL, Acting Commissioner of Social Security, *Defendant-Appellee.* | **Andrew P. Rodovich**, *Magistrate Judge.* |

## O R D E R

Daniel Keys challenges the denial of his application for disability insurance benefits and supplemental security income under the Social Security Act. Keys claimed disability based on a number of conditions—constant back and neck pain, migraine headaches, systemic rheumatoid arthritis, a rotator-cuff tear, sleep deprivation, and depression. Keys argues principally that the administrative law judge erred by giving too much weight to the opinions of non-examining doctors who did not review medical evidence that his back condition had deteriorated. The ALJ's decision is supported by

substantial evidence. Also, while no one contends that Keys can return to his past construction work, no treating or other physician offered an opinion to the effect that Keys suffered from any condition impairing him to a degree that would have rendered him completely disabled. We affirm.

In late 2011 Daniel Keys, then 46 years old, applied for disability benefits, claiming that for the past three years he had been unable to work because of constant back and neck pain from degenerative disc disease, migraines, systemic rheumatoid arthritis, right-knee pain, impulse-control disorder, and adjustment disorder with depressed mood. In the years before his condition worsened (1997-2007), Keys worked in road construction. From 2008 to 2011, he did some home-improvement and carpentry projects, though this work was intermittent because of his pain.

Keys' back condition stems from an incident in 1998 when he was hit in the back with a backhoe's loading bucket. In an effort to relieve his pain, he has undergone six back surgeries: a 2002 thoracic fusion; 2004 and 2008 lumbar spinal fusions; a 2010 foramintonomy to relieve pressure on his spinal cord and 2010 diskectomies to replace two herniated discs; and a final September 2012 foramintonomy and diskectomy.

Treatment notes show that his pain generally improved after surgery, only to return shortly afterward. He reported relief after the 2008 surgery but complained that his lower-back pain returned within a few months. His pain improved again after the 2010 surgery, but a year later he had to see a pain physician regularly for lower-back and neck pain that radiated across his shoulders and left arm. He was treated with steroid injections and various medications in 2011 and 2012, but his pain persisted.

Several MRIs recorded the progression of his degenerative disc disease. In mid-2010, a cervical MRI revealed central-canal stenosis and multilevel-foraminal stenosis. Lumbar and cervical MRIs from mid-2011 show that his spine was generally within normal limits, though the lumbar MRI revealed mild narrowing of the central canal and neural foramina, and the cervical MRI showed mild left-neural foraminal stenosis but no sign of cord flattening. But MRIs in 2012 showed some changes: a cervical MRI in August reflected two bulging discs, mild foraminal narrowing, and minimal central narrowing; a lumbar MRI in May 2012 revealed mild and minimal central narrowing, mild foraminal and lateral recess narrowing, with the L3-L4 disc and facet touching the descending nerve roots.

Keys also experienced pain in his hands and joints that has been attributed to rheumatoid arthritis, carpal tunnel syndrome, a torn rotator cuff, and a torn ACL. His spine surgeon first observed signs of carpal tunnel in mid-2010 and recommended that he wear a brace. That condition continued to be present at doctor visits in April and

October 2011 as well as April 2012. In mid-2012, Keys's general practitioner noted that he wore a brace for right-wrist tenderness that Keys attributed to an "old injury."

Keys began showing signs of rheumatoid arthritis in late 2010 after two emergency room visits for multiple-joint pain and swelling in his left hand. In early 2011, his doctor described the swelling as "very severe." Keys could not perform fine finger movements, remove his wedding ring, or "turn on his street when he was driving." When Keys was diagnosed two months later with rheumatoid arthritis, his rheumatologist observed that hip pain limited him to walking only 100 yards.

Keys's right-knee problems began after he suffered a near-complete tear of his ACL in 2008. He cancelled a surgery scheduled for late 2008 after a death occurred in his family. Keys used a brace for stability but the injury kept him in constant pain. He eventually had the surgery in 2011 and within three months that pain had "significantly improved."

Keys's right-shoulder pain is his last remaining physical ailment. His torn rotator cuff was repaired in 2002, but in 2012 the shoulder was still tender and showed signs of tendinitis.

Dr. B.T. Onamusi, a state-agency doctor, examined Keys in early 2012 and concluded that chronic pain and headaches limited him to "sedentary to light" activities. He noted that Keys could sit for about five minutes, stand for fifteen, walk three blocks, and lift up to ten pounds. He also observed that Keys did not have trouble with gross or fine motor skills, including buttons or knots. Dr. Onamusi recorded that Keys's grip strength was twenty-five pounds in his right hand and thirty-five pounds in his left. His final assessment was that Keys suffered from chronic neck and lower-back pain, multiple-joint pain probably related to rheumatoid arthritis, and recurrent migraine headaches.

Around that same time Dr. M. Brill, another state-agency doctor, reviewed Keys's medical records without a physical exam and concluded that Keys could stand and sit for six hours in an eight-hour workday with occasional climbing, stooping, balancing, kneeling, crouching, and crawling, and had no upper extremity limitations apart from being able to frequently lift ten pounds and occasionally lift twenty pounds.

Dr. Candace L. Martin, an agency psychologist, evaluated Keys in early 2012. She concluded that Keys did not show signs of clinical depression. Dr. Martin noted that Keys's constant pain made him feel depressed and irritable, and she diagnosed him with impulse-control disorder and adjustment disorder with depressed mood.

Soon thereafter the agency denied Keys's claims, and Keys requested reconsideration. Another agency non-examining doctor, Dr. J. Sands, concurred with Dr. Brill's opinion, and the agency denied Keys's claims again.

At a hearing before an ALJ in early 2013, Keys testified that pain severely limited his ability to walk, stand, and use his hands and arms. He said that most of his pain was in his lower back, making his legs go numb and tingle, and that standing, sitting, or walking too long aggravated his pain. He also stated that his hands tingled and went numb from neck pain, making it hard to hold things. He reiterated that he needed help with buttons and knots.

The ALJ applied the required five-step analysis for assessing disability, see 20 C.F.R. § 404.1520(a)(4), 416.920(a)(4), and found that Keys was not disabled. The ALJ determined that Keys had not engaged in substantial gainful employment since his alleged onset date in December 2008, despite his part-time work (step one); that his conditions ("lumbar degenerative disc disease; spondylosis; bulging disc at C2-3 and C7-T1; back and neck pain; rheumatoid arthritis; osteoarthritis of right knee, status post-surgery in 2011; rotator cuff tear") were severe impairments (step two); that these did not equal a listed impairment (step three); that he had the residual functional capacity to perform light work, with the limitation of occasionally climbing ladders, ropes, scaffolds, ramps and stairs, and occasionally balancing, stooping, kneeling, crouching, and crawling (step four); and that he could not perform any past relevant work as a carpenter, concrete-paving supervisor, or home repairer.

In determining residual functional capacity, the ALJ found that Keys's testimony was not consistent with the medical record. The ALJ discounted Keys's claims that he could not walk further than a block, sit, stand, lift, or use his hands effectively. The ALJ cited Dr. Onamusi's observation that Keys could use his hands and treatment notes from 2012, when Keys moved freely, used his hands normally, or said that his pain had improved. The ALJ assigned great weight to the opinions of Drs. Onamusi, Brill, and Sands because they were consistent with the record. At step five, based on the testimony of a vocational expert that Keys could perform jobs such as cashier, retail marker, and furniture rental consultant, the ALJ concluded that he was not disabled. The Appeals Council denied further administrative review. On judicial review, a magistrate judge presiding by consent under 28 U.S.C. § 636(c) affirmed the ALJ's decision.

On appeal, Keys argues that the ALJ made two errors in according great weight to the opinions of Drs. Brill and Sands—agency physicians who had not examined him. First, he says that the doctors did not review either the two spinal MRIs showing new "mild" and "minimal" narrowing or the report from his back surgery in late 2012. The

information in these documents, Keys suggests, should have (1) counseled the doctors to recommend a more limited residual functional capacity and (2) prompted the ALJ to order the doctors to reconsider their opinions.

It is true that Drs. Brill and Sands did not review these later reports, but Keys has not provided any evidence that the reports would have changed the doctors' opinions. If an ALJ were required to update the record any time a claimant continued to receive treatment, a case might never end. *Scheck v. Astrue*, 357 F.3d 697, 702 (7th Cir. 2004). Keys did not explain how the findings on those reports undermine the uncontroverted opinions of Drs. Brill and Sands, who found limitations in Keys' ability to lift, carry, and perform postural movements, but limitations that did not render him completely disabled. Keys did not provide such evidence, so it was not error for the ALJ to rely on the opinions of Drs. Brill and Sands.

Second, Keys argues that Drs. Brill and Sands did not specify in their opinions that they considered his rheumatoid arthritis or rotator-cuff tear. Indeed, the doctors also did not discuss these conditions, but this omission does not mean that their opinions could not be accorded great weight by the ALJ. The agency regulations do not prevent the ALJ from according great weight to a doctor who has considered only some of the claimant's conditions, see 20 C.F.R. § 404.1527, although the regulations do require the ALJ herself to consider all impairments in combination. See 20 C.F.R. § 404.1523; *Enstrand v. Colvin*, 788 F.3d 655, 661 (7th Cir. 2015). The ALJ accounted for Keys's arthritic and rotator-cuff conditions when she credited the opinion of Dr. Onamusi, who performed a physical examination of Keys and specifically considered both his arthritis and his rotator cuff tear. The ALJ then discussed these conditions in her opinion, acknowledging Keys's history of arthritis and shoulder dislocations due to the rotator-cuff tear. That Drs. Brill and Sands did not also address these two conditions does not undermine the ALJ's decision to accord their opinions great weight.

Keys next argues that the ALJ did not support her decision in formulating the residual functional capacity to impose no upper-extremity limitations. First, he asserts generally that the ALJ did not address his carpal tunnel symptoms. But the ALJ did address these symptoms. She observed that he had tested positive in April 2012 for signs of carpal tunnel, and that tests later that year did not show signs of carpal tunnel—and that his doctor for several visits did not even test for carpal tunnel. Second, Keys asserts that the ALJ overlooked evidence that his arthritis "flares up" and occasionally impairs his hands. But the ALJ discussed these symptoms, too. She acknowledged Keys's testimony that arthritis pain limited the use of his hands, but pointed out that his testimony was contradicted by Dr. Onamusi's report that he could perform fine fingering motions. The ALJ's analysis of Keys's arthritis and carpal tunnel syndrome was sufficient

to support her decision to omit upper extremity limitations from the residual functional capacity.

Keys's final argument is that the ALJ omitted from her assessment of his residual functional capacity a limitation on concentration because she did not properly evaluate the "overlay" of his mental and physical symptoms. In his view, the ALJ relied on the lack of objective medical evidence of pain to discredit his testimony that pain affects his concentration. But Keys misapprehends the ALJ's analysis. The ALJ did not reject his testimony solely because there was no objective medical evidence; rather, the ALJ found Keys's testimony inconsistent with statements he made to his treating physicians between May and November 2012 that his pain had improved. See 20 C.F.R. § 404.1529(c)(4) (ALJ will assess inconsistencies in evidence, including the claimant's statements); *Schmidt v. Barnhart*, 395 F.3d 737, 747 (7th Cir. 2005). Once the ALJ decided not to credit Keys's testimony that pain limited his ability to concentrate, she did not err in her assessment of his residual functional capacity when she imposed no limitation on his concentration.

AFFIRMED.