In the

# United States Court of Appeals

## For the Seventh Circuit

─────────────

No. 17-2973

LETA PENROD, on behalf of Tod Alan Penrod, Deceased,

*Plaintiff-Appellant,*

*v.*

NANCY A. BERRYHILL.,
Acting Commissioner of Social Security,

*Defendant-Appellee.*

─────────────

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:16cv324— **William C. Lee**, *Judge.*

─────────────

ARGUED JUNE 6, 2018 — DECIDED AUGUST 15, 2018

─────────────

Before WOOD, *Chief Judge*, and KANNE and SCUDDER, *Circuit Judges*.

PER CURIAM. Leta Penrod brings this appeal on behalf of her deceased husband, Tod Penrod, who before his death applied for disability insurance benefits based on various impairments, including arthritis, diabetes, and high blood pressure. An administrative law judge determined that, despite

these impairments, Penrod retained the capacity to work through his last insured date. Because substantial evidence supports that decision, we affirm.

## BACKGROUND

Tod Penrod first applied for disability benefits and supplemental security income in September 2010, when he was 45. He alleged that he became disabled after a heart attack the previous month. An administrative law judge ("ALJ") denied Penrod's application for benefits in April 2012. The Appeals Council declined review, and the district court upheld the agency's decision, *Penrod v. Colvin*, No. 1:13-cv-131-APR, 2014 WL 2700253 (N.D. Ind. June 13, 2014). Penrod did not appeal to this court.

While Penrod's case was pending in the district court, he filed a second application for disability insurance benefits (but not for supplemental security income). This time he alleged that he was disabled because of arthritis, diabetes, high blood pressure, high cholesterol, short-term memory loss, and asthma. This second application, which is the subject of this appeal, covers the period from April 2012 (when the ALJ denied Penrod's first application for benefits) to June 2013 (his date last insured).

The relevant medical evidence is sparse. After his 2010 heart attack, Penrod received a stent and regular follow-up care for coronary artery disease. In January 2012 his cardiologist opined that Penrod had been "doing well from a cardiovascular standpoint," though he continued to experience occasional chest pain. The pain occurred more frequently when Penrod exerted himself or became anxious, but it sometimes

occurred when he was at rest. One nitroglycerin tablet typically relieved the pain when it did not subside on its own. In 2012 Penrod twice visited the emergency room with complaints of chest pain, though he did not require treatment on either visit.

Penrod's poverty and lack of health insurance coverage complicated his treatment. For example, in November 2012 Penrod told his cardiologist that he could not afford all of his prescribed medications or a recommended stress test.

Penrod also suffered from kidney stones during the relevant period. In January 2012 he had surgery to extract several stones and to implant a ureteral stent. Three months later he had another stone removed. And in October 2012 he visited the emergency room with "severe left flank pain," which was relieved with Toradol. Soon afterwards a urologist performed lithotripsy to clear an obstruction in Penrod's urinary tract.

A consultative physician, Dr. Vijay Kamineni, examined Penrod in May 2013 in connection with his application for benefits. Penrod identified his chief complaint as arthritis pain. Dr. Kamineni observed a limited range of motion in Penrod's spine, shoulders, and hips. Later x-rays of those areas showed moderate degeneration in Penrod's spine but no significant degeneration in his shoulders or hips. After reviewing Penrod's medical records, two consultative doctors agreed that he could perform light work, 20 C.F.R. § 404.1567(b), subject to certain postural and environmental limitations.

A different ALJ held a hearing on Penrod's second application for benefits in December 2014, 18 months after Penrod's date last insured. Penrod and his lawyer acknowledged

at the outset of the hearing that the period under considera-
tion was limited to April 2012 through June 2013.

Penrod testified about his work and medical history. He
said that he stood 5 feet and 8 inches tall and weighed about
255 pounds. He had dropped out of high school after the 11th
grade, and he had previously worked as a truck driver, la-
borer, and machine operator. The last time he had tried to
work was in 2012, when he worked full-time for a few months
at a mechanic's shop. But he had to quit because he was una-
ble to work at the pace that his employer wanted.

When the ALJ asked Penrod why he could not work, Pen-
rod focused on the difficulty of finding a job with his limited
education and job skills. Although he still drove two to three
days a week, he could not work as a truck driver because the
state revoked his commercial driver's license when he started
taking insulin. He added that, even if there were jobs he could
perform, he would not sell his house and move for "a $9.00 an
hour job." Pressed by the ALJ to focus on his functional limi-
tations, Penrod said that he would have difficulty working
because of his inability to stand or sit for prolonged periods,
limited grip, fatigue and dizziness from his medications, pain
in his hips and lower back, and kidney stones.

Penrod also testified about another heart attack he had in
September 2014, fifteen months after his date last insured. The
attack occurred while Penrod was being prepared for triple
bypass surgery, and he acquired four more stents as a result.
Leta confirmed that her husband's functioning had "gotten
much worse" since 2012, though she did not specify how
much of the decline had occurred after his date last insured.

A vocational expert testified about the number of jobs that someone with Penrod's limitations could perform. The ALJ asked the VE to consider a claimant who (subject to limitations for certain postures and work environments) could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; and sit, stand, and walk for up to six hours per eight-hour workday. The VE testified that such an individual could not do Penrod's past relevant work, but could perform light work as an accessories assembler, small products assembler, and laundry folder. The VE confirmed that jobs would still be available if the individual needed to sit or stand at will and was off-task up to 15% of the time, excluding scheduled breaks.

Two months after the hearing, Penrod died from cardiac arrest. Leta then took his place in the subsequent proceedings, including this appeal.

The ALJ denied Penrod's application for disability benefits. Applying the requisite five-step analysis, see 20 C.F.R. § 404.1520(a)(4), the ALJ determined that—from his alleged onset date through his date last insured—(Step 1) Penrod did not engage in substantial gainful activity; (Step 2) Penrod's coronary artery disease, hypertension, degenerative disc disease, obesity, kidney stones, and diabetes were severe impairments; (Step 3) none of those impairments equaled a listed impairment; (Step 4) he retained the residual functional capacity to perform a limited range of light work; and (Step 5) he could not perform his past relevant work but could perform the jobs that the VE identified.

In reaching this conclusion, the ALJ determined that although Penrod's impairments could result in the types of symptoms he alleged, the medical evidence did not support

his testimony about the degree of limitations he experienced. For example, the ALJ said that Penrod's "ongoing smoking behavior against medical advice … was inconsistent with the allegation of 'disabling' heart disease," his frequent reports to his doctors that he was "unable to afford medications and recommended tests," and his credibility generally.

The Appeals Council denied Penrod's request for review, and the district court upheld the ALJ's decision.

## ANALYSIS

In this court Leta first faults the ALJ for not reconciling her decision with that of the ALJ who denied Penrod's first application. Although the ALJ who denied Penrod's second application added degenerative disc disease and diabetes to Penrod's list of severe impairments, she formulated a slightly different residual functional capacity ("RFC") than the first ALJ had. As relevant here, the new RFC increases from four to six the potential hours of standing and walking in a day, and it does not include an accommodation for an extra three to five minute bathroom break in the morning and afternoon. Leta contends that the second ALJ should have identified specific improvements in Penrod's symptoms to justify a less restrictive RFC than the first ALJ's.

This argument fails for at least two reasons. First, Leta cites no authority—and we have found none—that requires an ALJ to use the same RFC that a different ALJ used in denying benefits for a prior period. Second, the newer RFC is not materially less restrictive than the older one. The newer RFC provides that the applicant needs "the option to sit or stand alternatively at will," which offsets the increase in the estimated number of hours Penrod could stand. And the newer RFC

also contains an accommodation that the applicant must be able to be off-task 10% of the time, which offsets the elimination of the two bathroom breaks.

Leta next faults the ALJ for "failing to consider the way that Penrod's peculiar symptoms are the exact symptoms that prefigure his subsequent repeat heart attack and later death." The upshot seems to be that because Penrod's heart problems proved fatal in 2015 they must have been disabling in 2012 and 2013. This argument is both illogical and inconsistent with the record. As discussed above, Penrod's cardiologist opined in January 2012 that he had been "doing well from a cardiovascular standpoint." True, Penrod experienced occasional chest pain in 2012 and 2013, but that was controlled with medication, and Leta does not explain how any latent heart problems imposed functional limitations before Penrod's date last insured in June 2013.

Leta concludes with a scattershot challenge to the ALJ's decision to give limited weight to Penrod's testimony about his limitations. The most compelling of these critiques is that the ALJ should not have discredited Penrod based on his inability to quit smoking. Penrod's addiction to cigarettes—an "unnecessary item[]," the ALJ said— in no way negates his claims about his inability to afford expensive medical treatment, nor the existence of "disabling heart disease." *See Childress v. Colvin*, 845 F.3d 789, 793–94 (7th Cir. 2017); *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000) ("Given the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health."). But the ALJ's analytical error is harmless here be-

cause Leta does not explain how any lack of specific treatments made Penrod's heart problems disabling *before his date last insured*.

Leta's remaining arguments are conclusory statements of boilerplate law, and they are all meritless. She says that the ALJ did not consider that Dr. Kamineni's consultative opinion "supports the limitations that Penrod opines in the range of motion limitations." But she does not say what additional limitations the ALJ should have included in the RFC analysis. And the two agency doctors considered Dr. Kamineni's opinion when they concluded that Penrod could do light work.

Leta also observes that "daily activities do not have a direct and immediate correlation to work." Contrary to Leta's suggestion, however, the ALJ did not improperly equate Penrod's daily activities with the activities of full-time work. *See Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013). Nor could she have, as the record makes clear that during the relevant time period Leta or the couple's daughter, not Penrod, performed most household work.

Next Leta contends that the ALJ should have considered how Penrod's noncompliance with his prescribed treatment might be partially attributable to unspecified "psychological conditions." Once again, Leta does not explain how Penrod's noncompliance interfered with his ability to work.

Finally, Leta argues that Penrod's work history strengthened his credibility. But "[t]he ALJ did not commit reversible error by failing to explicitly discuss [his] work history when evaluating [his] credibility." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017). And the failure to account for the mechanic job is consistent with the ALJ's conclusion because the

VE's opinion made clear that such a job is not one that some-one with Penrod's RFC could perform.

AFFIRMED